## In re the BAAN COMPANY SE-CURITIES LITIGATION.

### No. Civ.A. 98–2465(JHG).

United States District Court, District of Columbia.

April 12, 1999.

Andrew Neil Friedman, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for Laure Salerno, Mitchell Silver, Frieda Silver, John Diers, Karl–Heinz Grossman, and Paul M. Zemella.

Luis De La Torre, Securities & Exchange Commission, Washington, DC, for Securities and Exchange Commission.

Andrew Neil Friedman, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Steven Jeffrey Toll, Cohen, Milstein, Hausfeld & Toll, PLLC, Seattle, WA, for Emile Gladstone and see Hear Entertainment LLC.

## *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, Senior District Judge.

Pending in this Court are seven consolidated, but uncertified, class action lawsuits alleging securities fraud against the Baan Company, N.V. ("the Company") and certain of its officers and directors. The Company is a Netherlands corporation with offices in Reston, Virginia and the Netherlands. The Company sells enterprise resource planning ("ERP") software. Its common stock trades on the Amsterdam Stock Exchange. Its securities also trade on six stock exchanges in Germany. In this country, the Company's American Depository Receipts ("ADRs") trade on the NASDAQ National Market System under the symbol BAANF. The named plaintiffs are purchasers, in modest amounts, of ADRs, common stock or, in one case,

seven call options on ADRs. Many if not most of the proposed "Baan Shareholder Group" have unrealized losses of less than $5,000.

The class periods differ, but the cases share the same nucleus of operative facts. Plaintiffs accuse the Company and some of its senior officers of issuing misleading statements concerning the Company's financial health, failing to abide by generally accepted accounting principles ("GAAP"), and other fraudulent activities which caused the stock price to be inflated. Certain senior officers also are alleged to have profited from these activities through insider trading.

The Private Securities Litigation Reform Act of 1995, codified at 15 U.S.C. §§ 78u–4, 78u–5 ("PSLRA"), directs a court faced with one or more class actions arising under the Securities Exchange Act of 1934 to select a Lead Plaintiff early in the case, and then to review the Lead Plaintiff's choice of Lead Counsel. Pending before the Court is a motion to designate as "Lead Plaintiff" a 20–member subgroup of the 466 investors calling themselves the Baan Shareholder Group and to approve of their selection of a committee of four law firms to serve as Lead Counsel, with an additional firm to play the role of "Plaintiffs' Liaison Counsel."

The PSLRA envisions a mixed inquisitorial/adversarial model for developing a record to make the Lead Plaintiff decision. In a case where more than one group vies for Lead Plaintiff status, the Court usually receives the benefit of the adversarial process to have the merits developed before rendering a decision.[1] In a case such as this, where no opposition has been noted, Congress envisioned that courts still would play an independent, gatekeeping role to implement PSLRA. At the same time, Congress envisioned that the Court would do this with

dispatch. To ease the burden of developing the record under this inquisitorial model, this Court invited the Securities and Exchange Commission ("SEC") to favor her with a brief *amicus curiae* on the pending motions, as the SEC has done in other securities class actions.[2] Because the SEC's views on the PSLRA's Lead Plaintiff and Lead Counsel provisions have been helpful to this Court and may be helpful to others, and because the SEC's views appear to have been disseminated only on a case-by-case basis, this Court has taken the unusual step of appending the SEC's brief to this Opinion. The Court does not necessarily endorse any or all of the SEC's views but believes that those views should be made available more widely without requiring other courts to seek out the SEC individually.

Having considered the Baan Shareholders Group's motion and the views of the SEC as *amicus,* the Court is persuaded that the Lead Plaintiff motion must be denied. The Lead Counsel motion will be denied without prejudice.

### DISCUSSION

Responding to perceived abuses, Congress, in the PSLRA, altered the procedures for bringing class actions under the federal securities laws. Congress's principal focus, as reflected in the legislative history, was that plaintiff investors, and not their counsel, make the ultimate strategic decisions in litigation. *E.g.,* H.R.Rep. No. 104–369 at 32 (1995) *reprinted in* 1996 U.S.C.C.A.N. pp. 730, 731 (Lead Plaintiff provision designed to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs counsel.").

---

1. It sometimes occurs that groups which start out in adverse positions form alliances, leaving it to the Court to divine the arguments adverse to the alliance and to weigh the relative merit of those arguments. Defendants generally have been held to lack standing to challenge appointment of lead plaintiff. *See, e.g., Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 60–61 (D.Mass. 1996); Stuart M. Grant, *Appointment of Lead Plaintiff Under the Private Securities Litigation*

*Reform Act,* 1070 PLI/Corp. 547, 555–56 (1998) (collecting cases).

2. Indeed, plaintiffs responded to the SEC's *amicus* brief, providing the Court with further useful information concerning how proposed lead counsel would litigate the case, information that plaintiffs had deemed unnecessary to include in their unopposed initial motion.

The PSLRA directs the Court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class." 15 U.S.C. § 78u–4(a)(3)(B)(i). The Act creates a "rebuttable presumption ... that the most adequate plaintiff ... is the person or group of persons that (aa) has either filed the complaint or made a motion in response to a notice ... (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* § 78u–4(a)(3)(B)(iii)(I). The presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately represent the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u–4(a)(3)(B)(iii)(II). Finally, the PSLRA states that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* § 78u–4(a)(3)(B)(v).

While Congress provided flexibility for a "group of persons" to be lead plaintiff, "[t]he most important open question under the lead plaintiff section of the PSLRA is whether *unrelated* individuals or institutions may aggregate their shares in order to be deemed the 'most adequate plaintiffs'...." John C. Coffee, Jr., *Developments Under the Private Securities Litigation Reform Act of 1995: The Impact After Two Years,* SC53 ALI–ABA 395, 423 (1997) [hereafter Coffee, *Developments Under the PSLRA* ] (emphasis added). One court has suggested that unrelated individuals cannot be a "group of persons" under the PSLRA. *See, e.g., In re Donnkenny Inc. Secs. Litig.,* 171 F.R.D. 156, 157–58 (S.D.N.Y.1997). This Court believes that suggestion goes too far. The text of the PSLRA does not limit the composition of a "group of persons" to those only with a pre-litigation relationship, nor does the legislative history provide a sound enough foundation to support such a gloss.

Courts trying to implement Congress's intention that clients rather than lawyers control the litigation have divided when considering how to treat a Lead Plaintiff motion by a large group of unrelated investors. On one view:

> While the assertion can be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of control that those Plaintiffs can maintain over the conduct of the putative class action, an equally cogent assertion can be broached that, when more greatly numbered, the Lead Plaintiffs can more effectively withstand any supposed effort by the class counsel to seize control of the class claims.

*D'Hondt v. Digi Int'l, Inc.,* 1997 WL 405668 *3 (D.Minn. Apr. 3, 1997). On a related note, another court found that "diverse representation" of the plaintiff class was a value to be preserved in choosing a Lead Plaintiff. *See In re Oxford Health Plans, Inc. Secs. Litig.,* 182 F.R.D. 42, 49 (S.D.N.Y.1998) (appointing unrelated individuals and two institutions as co-Lead Plaintiffs).

On the other side, courts have determined that multiple lead plaintiffs will be unable to control the litigation, effectively negotiate retention agreements, and supervise the conduct of counsel. *See, e.g., In re Advanced Tissue Sciences Secs. Litig.,* 184 F.R.D. 346 (S.D.Cal.1998) ("The idea of appointing over 250 unrelated individual investors as lead plaintiffs runs afoul of Congress's intent in enacting the PSLRA"); *In re Milestone Scientific Secs. Litig.,* 183 F.R.D. 404, 417 (D.N.J.1998). When determining how many plaintiffs is too many, courts thus far have opted for a "rule of reason" approach. *E.g., Advanced Tissue,* 184 F.R.D. at 351–53 (winnowing proposed group of 250 to six).

For its part, the SEC also does not suggest an interpretation of "group of persons" that would erect a *per se* bar against aggregating previously unrelated investors. However, in its view:

> Construing the term 'group of persons' in light of the language and purposes of the Act, a court generally should only approve a group that is small enough to be capable of effectively managing the litigation and the lawyers. The Commission believes

that ordinarily this should be no more than three to five persons, a number that will facilitate joint decisionmaking and also help to assure that each group member has a sufficiently large stake in the litigation.

SEC Mem. at 16–17.[3]

Relying on intuition and experience, this Court generally shares the SEC's view that where unrelated investors are to be Lead Plaintiff, a triumvirate is preferable. With due respect for the *D'Hondt* court, this Court's experience with class actions and multidistrict litigation, such as resolution of the claims arising from an airline disaster, *see generally In Re Air Crash Disaster at Washington, D.C.*, 559 F.Supp. 333 (D.D.C. 1983) (Green, J.), teaches that a small committee will generally be far more forceful, effective and efficient than a larger aggregation. The Lead Plaintiff decision should be made under a rule of reason but in most cases three should be the initial target, with five or six as the upper limit. *See also Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 408–09 (D.Minn.1998) (winnowing plaintiff group of almost 300 to six); *Tumolo v. Cymer, Inc.*, No. 98–CV–1599, Or. at 2–4 (S.D.Cal. Jan. 22, 1999) (rejecting 339–member plaintiff group and alternative proposal for seven-member group with largest losses); *Zaltzman v. Manugistics Group, Inc.*, No. S–98–1881, Mem. Op. and Or. at 9–14 (D.Md. Oct. 8, 1998) (rejecting proposed 92–member plaintiff group and picking two with largest losses).

The 466–member Baan Shareholder Group assert that altogether they have the "largest financial interest in the relief sought by the class," but they propose that a "subgroup" of 20 be designated as Lead Plaintiff. *See* Pls.' Mem. at 10–11. Plaintiffs are playing a shell game with the statute. The statute's presumption is applied according to the "financial interest" of the "group of persons" proposed as Lead Plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). By that measure, the question is whether the 20–person subgroup has the largest financial interest in the relief and satisfy the other criteria. Even assuming they do, the Court believes that a 20–person committee would fail to play the role Congress envisioned for the Lead Plaintiffs.

According to the list provided by the Baan Shareholder Group, three of its members, Werner Hitzel, Peter Von Muralt, and Otto Weidmann, each have unrealized losses in excess of $300,000. Two of these are among the proposed subgroup, and each has filed a declaration stating his willingness to serve as class representative. *See* Declaration of Stephen T. Roddy Ex. B. However, the Court has no information regarding whether this troika would facially satisfy the criteria of Rule 23 of the Federal Rules of Civil Procedure. Information in that regard shall be filed in short order.

The facts of this case raise another consideration favoring a strong Lead Plaintiff. As with many securities class actions filed after passage of the PSLRA, this involves a high technology company. *See Coffee, Developments Under the PSLRA*, SC53 ALI–ABA at 401–02. The vast majority of the Baan Shareholder Group have relatively small holdings. As a result, it is likely that Lead Counsel will have a greater financial stake in this litigation than any of the individual plaintiffs. That may give rise to certain tensions.

In settlement discussions, or if liability is established, counsel may assume that the interest of the class is to receive the maximum payment possible, even if such payment would threaten the Company's ability to remain an on-going concern. *See id.* at 401 (average market capitalization of company sued in federal securities class actions post-PSLRA has shrunk significantly). But the majority of the Baan Shareholder Group—

---

**3.** It is not surprising that these different views would emerge, given that courts can only speculate as to how a group of investor-plaintiffs and their counsel are likely to interact. It would be useful to have some social science data on how groups of lead plaintiffs, varying in size and with varying stakes in the litigation, interact with counsel regarding proposed settlements and other important strategic decisions. *Cf.* Eric A. Posner, *The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions On Collective Action*, 63 U.Chi.L.Rev. 133, 139 & n. 12 (1996) (citing economically-oriented social science material on general collective action issues and concluding that these studies have yielded inconclusive results).

who have indicated that they are typical of the class—continue to hold their securities; their losses remain unrealized. Stock prices in the high technology sector are known to be volatile. *Id.* Depending on their view of the market for the Company's product, and the market for the Company's stock, it may be in the class members' interest to settle for less in this case to preserve the Company's viability, in the hope of reaping potential benefits from future increases in the stock price. Assuming the class shares a common interest in this regard, Congress envisioned that they would have a strong Lead Plaintiff who will assert that interest when making significant litigation decisions.

Accordingly, it is hereby

**ORDERED** that the Baan Shareholder Group's Lead Plaintiff motion is DENIED. It appears that in some respects Werner Hitzel, Peter Von Muralt, and Otto Weidmann collectively are entitled to the statutory presumption of Lead Plaintiff status. Not later than **April 21, 1999,** counsel for Messrs. Hitzel, Von Muralt and Weidmann shall file a statement profiling the class and addressing whether these three individuals, collectively, satisfy the Rule 23 inquiry, as set forth in 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc). This is not a final, appealable order. *Cf. Metro Services, Inc. v. Wiggins,* 158 F.3d 162, 165 (2d Cir.1998).

**FURTHER ORDERED** that plaintiffs' Lead Counsel motion is denied without prejudice. Once Lead Plaintiffs have been designated, the Court will entertain a motion to approve of their choice for Lead Counsel.

IT IS SO ORDERED.

## APPENDIX

In re the BAAN COMPANY SECURITIES LITIGATION.

Laure Salerno, on behalf of herself and all others similarly situated, Plaintiff,

v.

Baan Company, N.V., et al., Defendants.

No. Civ.A. 98–2465(JHG).

No. Civ.A. 1:98CV02465(JHG).

United States District Court,

District of Columbia.

### MEMORANDUM OF THE SECURITIES AND EXCHANGE COMMISSION, AMICUS CURIAE

### INTRODUCTION AND SUMMARY OF THE COMMISSION'S POSITION

Pursuant to the Court's orders dated February 16 and March 8, 1999, the Securities and Exchange Commission respectfully submits this memorandum, as *amicus curiae,* to address issues raised by the pending motion for appointment of lead plaintiff and lead counsel under the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "Act"), codified at Sections 21D & 21E of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78u–4 & 78u–5. Specifically, the Commission will discuss, as invited to do so by the orders, two issues: (1) the appropriateness of appointing as lead plaintiff a proposed "group" of persons jointly seeking such appointment; and (2) the appropriateness of appointing multiple lead counsel.

The Commission, the agency principally responsible for the administration and enforcement of the federal securities laws, has long expressed the view that legitimate private actions under those laws serve an important role. They work to compensate investors who have been harmed by securities law violations and, as the Supreme Court has repeatedly recognized, they "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Commission action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), *quoting J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

In adopting the Reform Act, Congress affirmed that "[p]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses." It further stated that private lawsuits "promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, audi-

tors, directors, lawyers and others properly perform their jobs." Joint Explanatory Statement of the Committee of Conference, Conference Report on Securities Litigation Reform, H.R.Rep. No. 104–369, at 31 (1995) U.S. Code Cong. & Admin.News at 730 ("Conf.Rep.").

In the Reform Act, Congress established specific criteria for the appointment of lead plaintiff. 15 U.S.C. 78u–4(a)(3)(B)(iii)(I)–(III). Congress sought through the lead plaintiff provisions to ensure more effective representation of investors' interests in private securities class actions by transferring control of the actions from lawyers to investors. Conf.Rep. at 32–35. The Act's related provision governing the selection and retention of lead counsel, 15 U.S.C. 78u–4(a)(3)(B)(v), also is an important part of that effort. Conf.Rep. at 35.

With regard to the lead plaintiff motion, the Commission believes that the Court should limit the proposed lead plaintiff "group" to a small number capable of effectively managing the litigation and exercising control over counsel. With regard to the lead counsel motion, the Reform Act gives the lead plaintiff the initial choice of counsel, and ensures that only in very unusual circumstances will the lead plaintiff have to accept counsel that it did not choose for itself. However, the Act otherwise preserves the Court's traditional discretion to evaluate the likely effectiveness of proposed class counsel for the protection of the class, and the Commission believes the Court should actively exercise that discretion.[1]

1. The Commission takes no position on the ultimate questions of who should be appointed lead plaintiff and lead counsel under the circumstances of this case.

2. The presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff *** will not fairly and adequately protect the interests of the class *** or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. 78u–4(a)(3)(B)(i) & (a)(3)(B)(iii).

3. In general, the Reform Act appears to require that a court consider and decide a lead plaintiff application within 90 days of publication of the required notice of the action. *See* 15 U.S.C. 78u–

## BACKGROUND

### A. *The Reform Act's Lead Plaintiff and Lead Counsel Provisions*

The Reform Act generally provides that "the court *** shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the 'most adequate plaintiff') in accordance with this subparagraph." The Act then specifies that "the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that" meets three criteria:

(1) has filed a complaint or moved to be appointed as lead plaintiff;

(2) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. 78u–4(a)(3)(B)(iii)(I)–(III).[2]

The Act further provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. 78u–4(a)(3)(B)(v).[3]

### B. *Legislative History Of The Provisions*

The Reform Act was enacted in December 1995.[4] The Act's lead plaintiff provisions

4(a)(3)(B)(i). Where there is a pending motion to consolidate class actions, however, the Act states that the court shall not make a lead plaintiff determination "until after the decision on the motion to consolidate is rendered." 15 U.S.C. 78u–4(a)(3)(B)(ii). Under those circumstances, the Act provides no fixed time for appointing the lead plaintiff, but states that the appointment shall be made "[a]s soon as practicable after such [consolidation] decision is rendered." *Id.*

4. The Act was passed over a presidential veto. *See* 141 Cong.Rec. H15223–224 (Dec. 20, 1995), S19180 (Dec. 22, 1995). The President, however, did not object to the Act's lead plaintiff provisions. *See* 141 Cong.Rec. H15214–215 (Dec. 20, 1995). His veto was based on concerns about portions of the Act—the scienter pleading stan-

arose out of Congress' concern, reflected in the House, Senate, and Conference Committee Reports on the legislation, that some class action securities litigation had become a "lawyer-driven" enterprise, in which law firms sought to bring cases and then sought out plaintiffs in whose name they could sue.[5] Congress sought to "protect[ ] investors who join class actions against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer." Conf.Rep. 32, U.S. Code Cong. & Admin.News 1995 at 731; *accord* S.Rep. 4 (Congress "intends *** to empower investors so that they—not their lawyers—exercise primary control over private securities litigation"), 6 ("to transfer primary control of private securities litigation from lawyers to investors"), 10 ("The lead plaintiff should actively represent the class. The Committee believes that the lead plaintiff—not lawyers—should drive the litigation."). This concern also was expressed repeatedly during floor debate on the legislation.[6]

Congress viewed this problem as stemming from the fact that the lead counsel in

dard, safe harbor for forward-looking statements, and Rule 11 provisions—that are not presently at issue in this case. *See id.*

5. Congress was particularly concerned that in some such cases the lawyers engage in abusive practices and "often receive a disproportionate share of settlement awards." Conf.Rep. 36, U.S. Code Cong. & Admin.News 1995 at 735; *accord id.* at 31–33; Report on the Private Securities Litigation Reform Act of 1995, S.Rep. No. 104–98, 6–12 (1995), U.S. Code Cong. & Admin.News 1995 pp. 679, 685–691 ("S.Rep."); Report on the Common Sense Legal Reform Act of 1995, H.R.Rep. No. 104–50, 14–20 (1995) ("H.Rep.").

6. *See, e.g.,* 141 Cong.Rec. S8895 (Sen. D'Amato) ("the legislation empowers investors so that they, not their lawyers, have greater control over their class action cases"), S8897 (Sen. Domenici) ("So what we have and what is wrong with this system is very, very fundamental. Lawyers, not clients, control these cases.") (June 22, 1995); 141 Cong. Rec. S9040 (Sen. Domenici), S9055 (Sen. Frist) ("the lawyer-driven nature of these lawsuits tends to shortchange investors who have truly been defrauded"), S9065 (Sen. Grams) ("the plaintiff who is bringing the suit [now] *** this is basically the attorney"), S9075–76, 77 (Sen. Hatch) ("the bill contains a number of reforms of securities litigation class actions that are designed to increase participation of the real shareholder plaintiffs and decrease the control of attorneys"), S9077 (Sen. Murray) ("[investors] have a right to have more of a say in steering the course of litigation") (June 26, 1995); 141 Cong. Rec. S9172 (Sen. Hatfield) ("This legislation is about curtailing the abuses in this country's securities litigation system and empowering defrauded investors with greater control over the class action process."), S9173 (Sen. Mikulski) ("with this bill, the court will be able to pick one person—who has lost a lot of money in a class action suit—to be the leader. This way the system works for investors instead of against them," as when "lawyers seek out clients just so they can have cases to litigate") (June 27, 1995); 141 Cong.Rec. S9212 (Sen. Domenici) ("[bill] puts investors with real financial interests, not lawyers in charge of the case"), S9321 (Sen. Dodd) ("[bill] empowers investors so that they, not their lawyers, have greater control over their class action cases") (June 28, 1995); 141 Cong.Rec. S17934 (Sen. D'Amato) ("[Bill] will empower real investors, especially pension funds and other institutional investors, to take control of the lawsuit."), S17956 (Sen. Dodd), S17967, 17969 (Sen. Domenici) ("[Bill] contains provisions which place investors, not lawyers, in control of the lawsuit. Unlike the current lawyer-driven system, under this new law the investors with the greatest stake in the outcome of the litigation will control the case."), S17980 (Sen. Murray) ("[bill] will reform our securities law so that investors will have more of a say in the outcome of their suit"), S17982 (Sen. Frist), S17983 (Sen. Dole) ("[bill] diminishes the likelihood that these cases will be driven by lawyers, instead of real plaintiffs by allowing the most adequate plaintiff to be the party with the greatest financial interest"), S17984 (Sen. Moseley–Braun) ("Many investors also support this bill because it gives them, rather than the lawyers who are supposed to be working for them, control of any class action suits filed. It is the client, rather than the attorney, that is supposed to control a lawsuit, and part of the reason this bill is so necessary is that this simple principle has somehow gotten lost in recent years.") (Dec. 5, 1995); 141 Cong.Rec. H14038 (Rep. Cox) ("What we are seeking to do here is to protect investors so that they are in charge of these kind of lawsuits."), H14039 (Rep. Bliley) ("[bill] puts control of class action lawsuits back in the hands of the real shareholders, where it belongs"), H14048 (Rep. Harman) ("[bill] before us ends abusive practices and restores investor control over lawsuits"), H14050 (Rep. Deutsch) ("This bill will restore power to real investors in securities lawsuits, changing the rules so that actual investors, not predatory lawyers call the shots.") (Dec. 6, 1995); 141 Cong. Rec. S19054 (Sen. Hatch), S19084 (Sen. Reid) ("Defrauded investors are not adequately compensated because attorneys, not investors, control these class actions.") (Dec. 21, 1995).

the case commonly had a greater financial stake in the litigation than did the plaintiffs. *See, e.g.,* S.Rep. 6–7. The House Report stated, H.Rep. 17–18:

> Throughout the process, it is clear that the plaintiff class has difficulty in exercising any meaningful direction over the case brought on its behalf. \*\*\* Because class counsels' fees and expenses sometimes amount to one-third or more of recovery, class counsel frequently has a significantly greater interest in the litigation than any individual member of the class.

> Furthermore, class counsel \*\*\* may have a greater incentive than the members of the class to accept a settlement that provides a significant fee and eliminates any risk of failure to recoup funds already invested in the case.

The lead plaintiff provisions were "intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class." Conf.Rep. 32, U.S. Code Cong. & Admin.News 1995 at 731. They were "intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." *Id.*

In particular, Congress "intend[ed] that the lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits." *Id.* at 34, U.S. Code Cong. & Admin.News 1995 at 733. Congress "believe[d] that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions." *Id.*

Through the lead counsel provision, Congress gave the initial choice of lead counsel to the lead plaintiff, but "d[id] not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class." *Id.* at 35 U.S. Code Cong. & Admin.News 1995 at 734.

### C. *Facts*

Seven proposed class action suits have been filed in this Court against Baan Company, a Netherlands corporation with its principal executive offices in Virginia, and certain of its officers and directors. On February 16, 1999, the Court consolidated these actions. Plaintiffs allege that defendants fraudulently inflated the market price of Baan's securities by: (1) issuing statements that falsely reported Baan's financial condition and the success of its enterprise resource planning software and (2) entering into non-arms-length, related-party transactions to hide uncollectible receivables and inflate Baan's revenues. Baan's common stock trades overseas and its American Depository Receipts trade on the NASDAQ National Market System.

To the extent we can determine from papers on file with the Court, the "Baan Shareholder Group" consists of 466 individuals and entities alleging collective losses of $6.25 million and individual damages ranging from $12.50 to $566,000. Only seven members of the Group claim losses of $100,000 or more. The Group has sought appointment as lead plaintiff of a 20–person "subgroup" of its members "or, in the alternative, \*\*\* such other or all members of the Baan Shareholder Group." Motion for Appointment of Lead Plaintiffs ("Motion") at 3.[7]

7. Neither the Motion nor the accompanying legal memorandum provide any specific information about, or even name, the members of the Group or subgroup. For the names of the members of the subgroup, one must turn to the proposed order accompanying the Motion; for the only information about the Group, consisting of names and data relevant to damage calculations, one must turn to two attachments to a declaration of counsel: a 49–page chart organized alphabetically by name and 645 pages of individual certifications apparently not organized in any manner. *See* Declaration of Stephen T. Rodd, dated December 14, 1998 ("Rodd Decl."), Exhibits A & C. We were unable to find information in any of these sources about John Diers, a subgroup member. But because he is a named plaintiff, we reviewed the complaint he filed; as we understand the certification attached to it and the Group's damages methodology, he appears to claim losses of about $13,000.

Based on the limited information provided, the subgroup apparently consists of two individuals, one from New York and the other from Pennsylvania, who retained different counsel and filed separate actions against the defendants; a husband and wife; a pair of "joint tenants" from Massachusetts; an individual residing in Florida; an individual residing in Europe; and 12 other individuals identified only by name and alleged damages. The subgroup's members claim losses ranging from $780 to $566,000; three members of the subgroup, Walter Lem, Peter von Muralt, and Otto Weidmann, each allege losses of over $100,000 ($120,000, $309,000, $566,000, respectively), with the next highest loss being $65,273.[8]

The Group seeks appointment as lead counsel of the 15–attorney law firm of Abbey, Gardy & Squitieri; the 4–office (130–attorney) firm of Milberg Weiss Bershad Hynes & Lerach; the 45–attorney firm of Berger & Montague; and the 3–attorney firm of Shalov Stone & Bonner. *See* Rodd Decl., Ex. D. It also seeks appointment as liaison counsel of the 27–attorney law firm of Cohen, Milstein, Hausfeld & Toll, *see id.*, which appears to have acted as local counsel in all of the consolidated actions.

The Group's only record explanation of its counsel proposal is that "[t]hese firms have extensive experience in successfully prosecuting complex securities actions, and are qualified to represent the class." Memorandum of Law in Support of Motion ("Memorandum") at 13. Each of the proposed lead counsel represent the named plaintiff in a separate action against the defendants.[9] Neither the Motion nor any of the accompa-

nying papers, including the proposed order, describe the intended duties and responsibilities of the proposed lead law firms or liaison counsel. Nor do they describe the manner in which the law firms would function with each other and with members of the proposed lead plaintiff group.

## ARGUMENT

I. THE COURT SHOULD LIMIT A PROPOSED LEAD PLAINTIFF "GROUP" TO A SMALL NUMBER OF MEMBERS CAPABLE OF EFFECTIVELY MANAGING THE LITIGATION AND EXERCISING CONTROL OVER COUNSEL.

As noted, the Reform Act provides that "the court shall adopt a presumption that the most adequate plaintiff" is the "person or group of persons" that satisfies three requirements, including that the person or group "has the largest financial interest in the relief sought by the class." 15 U.S.C. 78u–4(a)(3)(B)(iii)(I). The Commission believes that to effectuate the Act's language and purposes, the Court should require class members who jointly seek to be appointed lead plaintiff to provide detailed information about their "group" and limit the "group" to a small number capable of effectively managing the litigation and supervising counsel.

Although the Act states that the lead plaintiff may be a "group of persons," this does not mean that the Court must accept as a "group" any number and assortment of persons proposed. Courts should interpret this general statutory language by reference to other of the Act's language, including the largest financial interest requirement, and to the Act's purposes.[10]

---

8. *See* Complaint in *Salerno v. Baan Company, et al.*, No. 1:98CV02465 (D.D.C. filed Oct. 16, 1998); Complaint and attached Certification in *Diers v. Baan Company, et al.*, No. 1:98CV02610 (D.D.C. filed Oct. 28, 1998); Proposed Order accompanying Motion at 2–3; Rodd Decl., Exs. A & C.

9. Abbey Gardy represents the named plaintiff in *Salerno v. Baan Company, et al.*, No. 1:98CV02465 (D.D.C. filed Oct. 16, 1998); Milberg Weiss the named plaintiffs in *Gladstone, et al. v. Baan Company, et al.*, No. 1:98CV02532 (D.D.C. filed Oct. 20, 1998); Berger & Montague the named plaintiffs in *Belmont, et al. v. Baan*

*Company, et al.*, No. 1:98CV02659 (D.D.C. filed Nov. 2, 1998); and Shalov Stone the named plaintiffs in *Diers v. Baan Company, et al.*, No. 1:98CV02610 (D.D.C. filed Oct. 28, 1998) and *Grossmann v. Baan Company, et al.*, No. 1:98CV02880 (D.D.C. filed Nov. 25, 1998). The certification included in Rodd Decl., Ex. C, indicates that Shalov Stone also represents subgroup member Waylee Chen.

10. *See Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 63–64 (D.Mass.1996), *citing John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94–95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993); *see generally United States v. Taylor,*

The Act refers to a "group of persons" in the provision which establishes a presumption that the "most adequate plaintiff" to lead a securities fraud class action is the one with the greatest claimed financial loss. 15 U.S.C. 78u–4(a)(3)(B)(iii)(I). As discussed above, Congress intended by that provision to protect plaintiff investors by making securities litigation less of a "lawyer-driven" enterprise, and by vesting control of the litigation in the lead plaintiff.

The presumption is intended to effect this by assuring that the lead plaintiff has a substantial stake in the litigation, and thus the ability and incentive to control the lawyers. This will, Congress anticipated, commonly be an institutional investor which has the sophistication and ability to control complex litigation. *See, e.g., Gluck v. Cellstar Corp.*, 976 F.Supp. 542, 548 (N.D.Tex.1997) ("The legislative history of the Reform Act is replete with statements of Congress' desire to put control of such litigation in the hands of large, institutional investors."); *Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 63–64 (D.Mass.1996) (same); *Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D.Cal.1997) ("The Reform Act affords large, sophisticated institutional investors a preferred position in securities class actions. *** Congress sought to eliminate figurehead plaintiffs who exercise no meaningful supervision of litigation."); pp. 219–221, *supra*.

As explained in a law review article cited in the Act's legislative history as "provid[ing] the basis for the 'most adequate plaintiff' provision," S.Rep. 11 n. 32 U.S. Code Cong. & Admin.News 1995 at 690, "[i]nstitutions' large stakes give them an incentive to monitor, and institutions have or readily could develop the expertise necessary to assess whether plaintiffs' attorneys are acting as faithful champions for the plaintiff class." Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institu-tional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2095 (1995) ("Weiss & Beckerman"). The authors further argue that institutions can obtain more favorable settlements, and should be "in a position to negotiate fee arrangements with plaintiffs' lawyers before class actions are initiated[,] *** [which] may well *** differ substantially from the fee structures that courts currently employ." *Id.* at 2107, 2121.

As noted in *In re California Micro Devices Secs. Litig.*, 168 F.R.D. 257, 275 (N.D.Cal. 1996), a non-Reform Act case, institutional investors "will be willing and able to monitor[ ] attorney conduct in securities class actions much more rigorously than either figurehead plaintiffs or courts can do." The court explained that:

> Institutional investors have financial interests in the outcome of securities class actions which dwarf the interests of individual plaintiffs, and with this increased financial interest comes an increased incentive to monitor class counsel's conduct of the action. Institutional investors, moreover, are much better situated to conduct such monitoring, both because they have greater resources and because, as repeat players in the securities class actions, they are experienced in the issues which these actions inevitably raise.

*Id.; see* 965 F.Supp. 1327, 1330–32 (N.D.Cal. 1997) (same case); *City Nominees, Ltd. v. Macromedia, Inc.*, No. C97–3521–SC, slip op. at 2 (N.D.Cal. Jan. 23, 1998) ("As courts have noted, large institutional investors have proven to be more efficient plaintiffs than unrelated plaintiffs grouped together, producing larger recoveries with smaller attorney's fees than individual plaintiffs."). The Commission has noted in other contexts that institutions have skills and expertise that are likely to be very valuable to investors, and are likely to devote substantial time and resources to representing investors in litigation.[11]

487 U.S. 326, 333, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988); *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983).

**11.** For example, the Commission has advised bankruptcy courts that institutional investors, while serving on creditors' committees, should be allowed to engage in trading in the securities of debtors, subject to certain restrictions designed to prevent trading on material nonpublic information. The Commission has noted that entities such as investment advisers, broker-dealers, pension funds, banks, and insurance companies "have skills and expertise that are likely to

This is not to suggest that an institutional investor must or should always be chosen as lead plaintiff. But it does strongly suggest that if a "group of persons" is to serve in that role, it should have comparable ability to control the litigation and the lawyers. *See* Conf.Rep. 34 ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake.").[12] The Baan Shareholder Group seems to acknowledge as much, when it contends (Memorandum at 11) that it alleges "a significant loss *** [that] is certainly large enough to ensure that [it] possesses a sufficient financial stake to remain active participants in this action and oversee its vigorous prosecution by counsel."

The mere fact that a proposed lead plaintiff group might have the largest combined financial stake, however, does not guarantee client control. A particular concern arises when lead plaintiff status is sought by a "group" of persons who were previously unaffiliated, each of whom have suffered modest losses, and who thus have no demonstrated incentive or ability to work together to control the litigation. The problem is made worse if the members have been recruited by counsel.[13] It ordinarily will be the case that

such an assemblage will be unable to manage the litigation and control the lawyers. The net result will be that while the "group" nominally has a large stake in the litigation, the lawyers will dominate decisionmaking.

Construing the term "group of persons" in light of the language and purposes of the Act, a court generally should only approve a group that is small enough to be capable of effectively managing the litigation and the lawyers. The Commission believes that ordinarily this should be no more than three to five persons, a number that will facilitate joint decisionmaking and also help to assure that each group member has a sufficiently large stake in the litigation. There may, of course, be unusual circumstances that warrant departure from these limits. Such circumstances might include pre-existing relationships among the group members or other factors indicating that they have a special capacity to provide able and unified decisionmaking independent of counsel. Each proposed member of the "group" should be evaluated separately, and the marginal benefit of including another member in the group weighed against the further division of decisionmaking authority and the attendant problems that enlargement of the group entails.

be extremely valuable to the [creditors'] committee," and that "[b]ecause such entities frequently have a substantial financial interest in the outcome of bankruptcy proceedings and can thus be expected to devote significant time and resources to the official committee's activities," discouraging participation in the committee by such institutions by totally disallowing trading "would be contrary to the best interests of public investors." *Memorandum of Securities and Exchange Commission in Support of Motion for an Order Permitting Securities Trading in Certain Circumstances,* filed in *In re WRT Energy Corp.,* No. 96–BK–5012 (Bankr.W.D.La. May 6, 1996) at 2, 4.

**12.** The law review article cited in the legislative history as "provid[ing] the basis for the 'most adequate plaintiff' provision," S.Rep. at 11 n. 32, suggests that Congress used the "group of persons" language because "if several institutions were interested in becoming involved, they could either compete to become lead plaintiff or agree to work together." Weiss & Beckerman, 104 Yale L.J. at 2108. The article also suggests that Congress used this language to encompass associated or affiliated institutions (*e.g.,* different

funds from the same mutual fund group), which, apparently because they viewed themselves as separate legal entities, had filed separate claims in pre-Reform Act class actions. *See id.* at 2090 n. 200.

**13.** In its report on the first year of practice under the Act, the Commission's Office of General Counsel stated that some lawyers, "[t]aking advantage of [the Act's] provision" allowing appointment of a "group of persons" as lead plaintiff, have attempted "to recruit investors as additional clients." Office of the General Counsel, Securities and Exchange Commission, *Report to the President and the Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995* 65 (Apr.1997) ("SEC Staff Report"). Specifically, some lawyers have "phrased [notices to the class under the Act] in a way more likely to attract clients, rather than competition from investors (and other law firms) independently vying to be named lead plaintiff." *Id.* at 65–66.

If the proposed group is so large that its own counsel deem it necessary to tender a "subgroup" of its members or, as it is sometimes called, a "steering committee," to manage the litigation effectively and efficiently, then this indicates that the larger assemblage is not a "group" within the meaning of the Act. Of course, the subgroup or steering committee may not constitute a "group" under the Act either; simply because counsel have designated it and it is smaller than some other assemblage of class members does not immunize it from scrutiny by the court. In general, except in unusual circumstances, to ensure adequate monitoring, coordination, and accountability, a "group" should have no more than five members, and the fewer the better.[14]

In order for the court to conduct such an analysis, the proposed lead plaintiff should provide full information about the "group." Such information should include detailed descriptions of its members, including their background, experience, and capabilities relating to the role of lead plaintiff; any pre-existing relationships among them; the manner in which the "group" was formed; an explanation of how its members would function collectively; and a description of the mechanism that the group members and lead counsel have established to communicate with one another about the litigation.

A number of courts have endorsed these principles. In *Ravens v. Iftikar*, 174 F.R.D. 651 (N.D.Cal.1997), the court denied without prejudice a proposed group's lead plaintiff motion, in part because the "group" had failed to provide the court with sufficient information about its members. The court stated that "implementing Congress' command to select lead plaintiffs who will control the litigation and direct the lawyers, rather than the other way around, requires that" the proposed group describe its members' "background, experience and capabilities." *Id.* at 662–63. In the court's view, "[t]he absence of that information here, and the failure of the plaintiffs to share any of it with the class in the notice, press release or even the pleadings, makes those documents insufficient to realize an important goal of the Reform Act." *Id.* at 663.

In evaluating a proposed group's lead plaintiff motion in *In re Milestone Scientific Secs. Litig.*, 183 F.R.D. 404, 418 (D.N.J. 1998), the court stated that "[t]he composition of the proposed [group] must be scrutinized carefully." The court recognized that a motion for appointment of a "group" raises "concerns regarding the division of authority and dilution of control" with respect to the conduct of the litigation. *Id.* After analyzing the composition and organization of the group, the court granted the lead plaintiff motion, determining that the group "provides a cohesive unit capable of unified decision-making."[15]

In *In re Donnkenny Inc. Secs. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y.1997), the court rejected a proposed lead plaintiff group consisting of "two unrelated institutional investors and four other individual class members." The "group" was formed from two previously competing lead plaintiff movants, and included an institution with nearly $2 million more in losses than any other member. The court found that the movants had not justified appointment of a "group," *id.* at 158, and appointed as lead plaintiff the "person"—the institution—with far and away the largest financial interest in the case. The *Donnkenny* court explained its rejection of the proposed group as follows:

To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the

---

14. Because the Reform Act does not contemplate a "subgroup" or "steering committee," but only provides for a single, properly constituted group, the court should take into account only the financial interests of the members of that group. Thus, if the court determines to reduce the number of members in a proposed "group" or "subgroup" to a manageable size, it should only consider, in calculating the financial interest of the group, the interest of those members that remain. *See* 15 U.S.C. 78u–4(a)(3)(B)(iii)(I).

15. It consisted of (1) an individual who is the chairman of the board, chief executive officer, and director of a mutual fund and who is the owner and one of two limited partners of an equity management firm that is the general partner of the mutual fund; (2) his wife; (3) the mutual fund; and (4) the equity management firm. *See id.* at 406, 418.

purpose of choosing a lead plaintiff. One of the principal legislative purposes of the [Reform Act] was to prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest *** was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers. To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff.

*Id.* at 157 (citation omitted).

In *In re Oxford Health Plans, Inc. Secs. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y.1998), the court limited a proposed 30-member lead plaintiff group to its three members with the most losses, "each of whom has suffered from two to three million dollars in losses." The court stated that "the limited size of the Vogel Group coupled with the scope of each individual's loss will make the Vogel Group, as reduced by the Court, an effective monitor of its counsels' performance, thereby fulfilling the purpose of the [Reform Act]." *Id.*

In *City Nominees v. Macromedia*, No. C97-3521-SC, slip op. at 2, the court noted that "one purpose of the [Act] was to reduce the tremendous influence that the plaintiff's bar had over securities class action lawsuits." According to the court, "the legislative history discusses the need to limit the number of plaintiffs in order to improve the monitoring

of the attorneys." *Id.* at 6. The court held that the "appointment of 36 lead plaintiffs is inconsistent with the goal of restoring the control of lawsuits to plaintiffs. 36 lead plaintiffs would make the administration of this complex civil action even more complex." *Id.* at 7. Noting that "counsel has presented no rationale for the breadth of the proposed group," the court accepted an alternative proposal of 6 persons as lead plaintiff as "not the ideal outcome envisioned by the framers of the [Act]," a "permissible, but suboptimal, result." *Id.* at 6, 7.[16] *See In re Graham–Field Health Products Litig.*, No. 98–CV–19:3 (DRH), slip op. at 3, 4 (E.D.N.Y. Aug. 10, 1998) (declining to approve unopposed motion of 50 persons to be appointed lead plaintiff because "there is a significant question as to whether it is appropriate to appoint such a large group as lead plaintiff" and "it may well be that to appoint such a large lead plaintiff group would be to defeat the [Act's] purpose");[17] *In re Informix Corp. Sec. Litig.*, No. C–97–1289–SBA, slip op. at 6 (N.D.Cal. Oct. 17, 1997) (rejecting large proposed lead plaintiff group, stating that it "would not be able to have the type of meaningful participation in the conduct of the litigation which was one of the guiding purposes of the lead plaintiff provisions ***. Appointment of a select group of investors with significant losses would fulfill the statutory goal of having plaintiffs who suffered significant losses control the litigation.").[18]

The Baan Shareholder Group cites the statutory language "group of persons" for

---

**16.** The *Macromedia* court was troubled by "some tension between the stated purpose of the [Act] and its statutory language." The Commission believes this appearance of "tension" was created by the fact that the court did not pursue its analysis of the language "group of persons" beyond the general observation that the Act permits appointment of more than one person. *See* slip op. at 6–7. Because the lead plaintiff motion was unopposed, the court did not have the benefit of an adversarial presentation on the issue.

**17.** Courts should discourage the practice described in *Graham–Field, id.* at 3, whereby, "perhaps in an attempt to downplay the number of individuals and entities which seek to be appointed lead plaintiff, movants do not in their moving

papers even list all members of the [proposed] Plaintiffs Group or mention the total number of members; instead, counsel merely refers to the annexed certifications submitted by each member of the proposed lead plaintiff group." This practice makes it even more difficult for the court (or a party or amicus) to assess the "group."

**18.** In *Informix,* counsel for the large "group" proposed a nine-person alternative, which the court accepted. The court's analysis of the alternative proposal is not set forth in its opinion, which, because the lead plaintiff motion in that case was unopposed, was rendered without the benefit of an adversarial presentation.

the proposition that a "group" may be appointed lead plaintiff (Memorandum at 8), but never provides a meaningful explanation of what a "group" is.[19] It cites two cases (Memorandum at 8) for the proposition that "a group of plaintiffs may be appointed under the Act, and courts routinely appoint groups of lead plaintiffs in accordance therewith." But neither of these cases holds that a "group" can be of unlimited size and indiscriminate composition; the issue does not appear to have been contested, briefed, or argued in one of the cases, a circumstance that is a common one.[20]

As noted, a number of cases have limited the size of groups that may be appointed lead plaintiff. The only cases of which we are aware that contain any suggestion that limitations might be inappropriate are two decisions by Magistrate Judge Erickson, in *D'Hondt v. Digi Int'l Inc.*, 1997 WL 405668, at *3 (D.Minn. Apr. 3, 1997) and in *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398 (D.Minn.1998). In *Chill,* the later of the two cases, the magistrate judge appointed a six-person "smaller subset" of a large proposed lead plaintiff group, but stated, "[w]e do not suggest that either Rule 23, or the [Reform Act], warrants an arbitrary limit on the number of proposed Lead Plaintiffs, for we only hold that, in a case-by-case inquiry, a rule of reason prevails." 181 F.R.D. at 409. The Commission, however, is not suggesting an "arbitrary" limit on the size of the group, but rather an approach that is informed by the language and purposes of the Act and detailed information about each proposed group.

In *D'Hondt,* 1997 WL 405668, at *3, Magistrate Judge Erickson appointed 21 persons as lead plaintiff over defendants' objections, stating that while it might be argued that a large lead plaintiff coalition would dilute the plaintiffs' control over the action, "an equally cogent assertion can be broached that, when more greatly numbered, the Lead Plaintiffs can more effectively withstand any supposed effort by the class counsel to seize control of the class claims." We respectfully suggest that in ordinary circumstances this will not be true. This is not a contest in which numerosity is an asset. We believe that a small number of well-motivated, financially interested plaintiffs will be far more willing and able to control counsel than will a large, dispersed coalition of persons who each have only a modest stake in the outcome of the litigation.

**19.** The meaning depends, of course, on the context in which the term "group" is used. In other contexts the term might have a different meaning. This is the case under Exchange Act Section 13(d), 15 U.S.C. 78m(d), which, speaking generally, requires disclosure to the market when a "person" acquires more than a specified percentage of certain securities, and which specifies that a "person" may include a "group." Because the purpose of Section 13(d) is to provide disclosure to the market of certain levels of securities acquisitions, it makes sense in that context for a "group" to include all persons acting in concert.

**20.** *See, e.g., Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 64 (D.Mass.1996) (granting unopposed motion of three persons to be lead plaintiff without analysis of aggregation issue); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *5 (N.D.Ill. Aug. 11, 1997) (appointing as lead plaintiff one coalition of plaintiffs over competing coalition without analysis of aggregation); *Zuckerman v. Foxmeyer Health Corp.,* 1997 WL 314422, at *2 (N.D.Tex. Mar. 28, 1997)

(appointing 11 persons as lead plaintiff over defendant's objection to appointment of multiple lead counsel; no analysis of aggregation); *In re Cephalon Secs. Litig.,* 1996 WL 515203 (E.D.Pa. Aug. 27, 1996) (same as *Greebel;* one-page memorandum and order); *In re Ride, Inc. Sec. Litig.,* Master File No. C97–402WD, Order at 3 (W.D.Wash. Aug. 5, 1997) (same as *Lax* ); *Bobrow v. MobileMedia, Inc.,* No. 96–4715 (D.N.J. Mar. 31, 1997) (letter opinion summarily rejecting one plaintiff coalition's argument that it had larger financial interest than another because it included the person with more shares than anyone else); *Chan v. Orthologic Corp.,* No. CIV 96–1514 PHX RCB, slip op. at 4–5 (D.Ariz. Dec. 19, 1996) (same as *Lax* ); *Powers v. Eichen,* No. 96–1431–B (AJB) (S.D.Cal. Nov. 15, 1996) (order devoid of analysis). The courts in *In re Read–Rite Corp. Sec. Litig.,* No. C–97–20059 RMW (N.D.Cal. May 28, 1997) and *In re Diamond Multimedia Sys., Inc. Sec. Litig.,* No. C 96–2644 SBA (N.D.Cal. Jan. 13, 1997), discuss the aggregation issue only briefly and without detailed analysis of the lead plaintiff proposals in those cases.

Some proposed lead plaintiff "groups" also have relied on policy arguments, but they have failed to come to terms with Congress' clear policy judgment that a lead plaintiff in a securities fraud class action should have effective control of the litigation and the lawyers. For example, when the court in one case raised the issue of client control, the counsel for the "group" attempted to define the objectives of the Reform Act in terms of "better filed complaints, better prosecuted cases." Counsel neglected to mention that Congress believed that those benefits flow from client control. *See* pp. 219–221, *supra.*[21]

Some of these "groups" have instead attempted to justify their lead plaintiff motions on grounds that have no support in the language or history of the lead plaintiff provisions. One "group" asserted that it was formed "in an effort to ensure the broadest *** representation of the class," a "diversified combination," a "diverse group," a "balanced combination" capable of representing "the diverse interests" of the class, a "diverse, balanced group of class members," a "balanced mix of individual and institutional plaintiffs," and a "broader cross section of the Class, provid[ing] fuller representation," than an institutional investor. Asserting that there is "strength in the group" and "in numbers," that "one plaintiff may have a defect and another one won't," and that the court should "avoid the danger of appointing a single Lead Plaintiff and Lead Counsel with significant defects," that "group" appeared to urge the court to adopt a presumption in favor of more rather than fewer class representatives.

Such arguments ignore the fact that Congress adopted the largest financial interest requirement because it believed that large investors are best able to manage the litigation and the lawyers, that effective client control benefits all class members, and that larger investors can adequately represent the interests of smaller investors. The arguments cite no basis in the statutory language or legislative history for preferring a large "group" to a small one or to a "person," or for considering "diverse representation." *See Milestone*, 183 F.R.D. at 417 ("Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the [Act], that of empowering a unified force to control the litigation."). In fact, in adopting the financial interest requirement, Congress rejected the premise of these arguments that the requirement was unrepresentative of the class. *See, e.g.,* Conf.Rep. 34.[22]

Furthermore, the statutory presumption in favor of the "person" or properly constituted "group" with the largest financial interest in the litigation may be rebutted "only upon proof" that it "will not" fairly and adequately represent the interests of the class. 15 U.S.C. 78u–4(a)(3)(B)(iii)(II). Attempted justifications for large coalitions of plaintiffs based on "avoid[ing] the danger" that if the court appoints a person or small group it might appoint a lead plaintiff "with significant defects," or that "one plaintiff may have a defect and another one won't," seem to assume, rather than prove, the existence of such defects in the person or small group. The Commission believes that such arguments are contrary to the Reform Act.

---

21. Some plaintiffs have also argued that the Reform Act "was predominantly an attempt to limit participation of 'professional plaintiffs.'" In fact, Congress enacted separate provisions specifically addressed to the "professional plaintiff" problem. *See* 15 U.S.C. 78u–4(a)(3)(B)(vi) ("Restrictions on Professional Plaintiffs").

22. In construing the notice provisions of the Reform Act, the court in *Greebel*, 939 F.Supp. at 63–64 (citations omitted), stated:

*** Congress' purpose was not to ensure notice to the entire class, but merely to those sophisticated and institutional investors that

Congress deemed presumptively most adequate to serve as lead plaintiffs in securities class actions. *** The only contrary piece of legislative history advanced by FTP is an isolated statement made by Senator Boxer on the Senate floor as she argued in favor of the proposed Boxer–Bingaman Amendment *** [that] would have excised the statutory provisions tilting appointment of a lead plaintiff toward large investors and, in its place, allow the entire class of investors to vote on who should serve as lead plaintiff. The amendment did not carry.

II. ALTHOUGH COURTS SHOULD NOT, EXCEPT IN VERY UNUSUAL CIRCUMSTANCES, FORCE A LEAD PLAINTIFF TO RETAIN COUNSEL IT HAS NOT SELECTED ITSELF, THEY SHOULD ACTIVELY EXERCISE THEIR DISCRETION TO REVIEW MULTIPLE LEAD COUNSEL PROPOSALS.

A. *The Reform Act Contemplates that Courts Will Exercise Control Over the Selection of Lead Counsel.*

Although the Commission takes no position on whether the specific lead counsel arrangement proposed in this case should be approved, the Commission believes that it is proper, and indeed of critical importance, for a court to inquire into the appropriateness of multiple lead counsel in the circumstances of each securities class action in which multiple counsel is proposed. The nature and extent of this inquiry will vary with the circumstances of each case and may take as much or as little time as appropriate. The Reform Act provides detailed procedures and criteria for the appointment of the lead plaintiff, gives a large role in the choice of lead counsel to the lead plaintiff, and ensures that only in very unusual circumstances will that lead plaintiff have to accept counsel that it did not itself choose. However, the Act otherwise preserves the court's traditional discretion to evaluate counsel for the protection of the class. *See* 15 U.S.C. 78u–4(a)(3).

The Act provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. 78u–4(a)(3)(B)(v). One court has stated that this provision "[g]iv[es] the Lead Plaintiff primary control for the selection of counsel" and "was a critical part of Congress' effort to transfer control of securities class actions from lawyers to investors." *Gluck v. Cellstar Corp.,* 976 F.Supp. 542, 550 (N.D.Tex.1997). Through the lead plaintiff provisions, including the lead counsel provision, Congress sought to eliminate the practice that had occurred at times where counsel effectively chose itself as lead counsel by selecting a plaintiff and initiating litigation.[23]

Although the lead counsel provision gives the lead plaintiff a large role in the choice of lead counsel, and contemplates that a court would impose additional or different counsel on the lead plaintiff only in very unusual circumstances, the selection of counsel remains "subject to the approval of the court." As noted, the legislative history of the provision makes clear that Congress did not intend to disturb the court's traditional discretion to protect the class by approving and disapproving the lead plaintiff's choice of counsel. Conf.Rep. at 35. In *In re Cendant Corp. Litig.,* 182 F.R.D. 144, 149–150 (D.N.J. 1998), the court noted that "[i]n contrast to the strictly defined procedures and considerations that prescribe the determination of lead plaintiff *** the Court's approval [of the proposed lead counsel] is subject to its discretionary judgment that lead plaintiff's choice of representative best suits the needs of the class," and "the Court should not rely solely on th[e] [lead plaintiff's] judgment" in that regard.

B. *The Appointment of Multiple Lead Counsel May Allow for the Pooling of Resources and Expertise, but May Also Engender Conflict, Delay, and Inefficiency in Class Action Litigation.*

There is no question that the appointment of multiple counsel may at times promote the effective management of class action litigation. A single firm may lack the resources to prosecute the action. For example, in *Oxford Health Plans, Inc. Secs. Litig.,* 182 F.R.D. 42, 46 (S.D.N.Y.1998), the court was "concerned with the potential costs and expenses of th[e] litigation" and with "the resources of the plaintiffs' counsel in order to support what could prove to be [the] costly

---

**23.** *See Fischler v. AmSouth Bancorporation,* 1997 WL 118429, at *1 (M.D.Fla. Feb. 6, 1997); Conf. Rep. at 35 ("[T]his lead plaintiff provision solves the dilemma of who will serve as class counsel[:] *** the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff.");

Weiss & Beckerman, 104 Yale L.J. at 2062–63, 2098 (explaining that before passage of the Reform Act courts would "generally appoint as lead counsel either the lawyer who files the first complaint or a lawyer elected by all the lawyers who have filed complaints").

and time-consuming litigation." After appointing "co-lead plaintiffs" (a decision with which the Commission disagrees), the court appointed as lead counsel each lead plaintiff's chosen law firm, two of which it described as "small" firms. *See id.* at 50 & n. 6. The court appears to have determined that "[i]n light of the magnitude of this case *** the sharing of resources and experience" was necessary "to ensure that the litigation will proceed expeditiously against Oxford and the experienced counsel it has retained to represent it." *Id.* at 49.[24]

Additional law firms may not only add resources, but may bring particular substantive expertise to a case. For example, a firm may have done extensive pre-filing investigation of a case and filed a well-drafted complaint on behalf of a client which was not selected as lead plaintiff. Such a firm may therefore possess considerable knowledge and experience about the case that would be of benefit in assuring its efficient prosecution. That firm might offer unique advantages "[t]o the extent this experience could be translated into a benefit to the class" and to the extent selection of the firm was otherwise consistent with effective and efficient litigation of the case. *In re Wells Fargo*

*Secs. Litig.*, 157 F.R.D. 467, 470 (N.D.Cal. 1995).[25]

On the other hand, appointment of multiple class counsel can fail to serve the interests of the class for various reasons. The greater the number of lead counsel, the more difficult it is likely to be for the lead plaintiff to manage the litigation and supervise the lawyers. In one pre-Reform Act case, for example, the court felt the need to caution that "[a]lthough '[t]he functions of lead counsel may be handled by one person or by several,' still 'the number should not be so large as to hamper the unity of direction that is needed.' " *See Ballan v. Upjohn Co.*, 159 F.R.D. 473 (W.D.Mich.1994) (quoting Manual for Complex Litigation (Second) § 20 .22 at 16). In "a case with eight law firms and one plaintiff," that court found that the three co-lead counsel had not "satisf[ied] the court that the [lead] plaintiff was willing and able to supervise so many firms." *Id.* In its report on the first year of practice under the Act, the Commission's staff identified two post-Act cases in which lead plaintiffs had selected 30 or 33 law firms as lead counsel, and noted that "even the most active institutional investor may have difficulty controlling thirty or more law firms." [26]

24. *See generally In re Wells Fargo Secs. Litig.*, 156 F.R.D. 223, 226 (N.D.Cal.1994) (explaining that "plaintiff law firms, which usually take cases on a contingent fee basis, join together to prosecute major complex cases because doing so allows them to leverage their resources and spread the risks of unfavorable outcomes"); Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L.Rev. 497, 546–47 (1991) ("Alexander") ("Plaintiffs' firms are quite small in comparison to defense firms, which frequently have hundreds of lawyers. *** Several plaintiffs' firms are involved in any case, in effect forming an 'ad hoc firm' for purposes of the litigation. The firms that specialize in securities class actions *** maintain a portfolio of such cases at any given time. Securities cases are large, complex and expensive to litigate, and take a long time to resolve. The number of such large cases a small firm can actively litigate at once is limited. *** For most plaintiffs' firms, taking even one large case to trial could seriously strain the firm's resources.") (footnotes omitted).

25. The Commission does not believe that a court should give any weight in evaluating a multiple counsel proposal (or later fee request) to which firm simply filed a complaint first or represents

the most clients in the case. The Commission does believe, however, that the court can and should award appropriate compensation to law firms, whether or not they have been selected as lead counsel, that do significant work investigating and bringing meritorious securities actions. *See In re Horizon/CMS Healthcare Corp. Secs. Litig.*, 3 F.Supp.2d 1208, 1214–15 (D.N.M.1998) (awarding fees to institutional investors' counsel which successfully objected to lead counsel's fees); Conf.Rep. at 33 (Congress sought to encourage "thoroughly researched" complaints and "diligence in drafting complaints"); Weiss & Beckerman, 104 Yale L.J. at 2108–09 (to "counter any hesitation [an attorney] might have about doing the prefiling investigation and other work necessary to prepare a complaint," if that attorney "is not retained by the lead plaintiff, the court should award her a reasonable fee for her efforts whenever the case results in a recovery for the plaintiff class").

26. SEC Staff Report at 51. The Report noted that the "phenomenon of multiple law firms representing the class was a familiar pattern prior to the Reform Act." *Id.*

Even prior to the Reform Act, courts expressed concern that appointing multiple class counsel could cause duplication of effort, increased attorneys' fees, friction or lack of coordination among counsel, and delay of the litigation.[27] Additional concerns associated with multiple counsel include unnecessary complication of the litigation, diminished accountability for its conduct, diminished incentives for each firm to make its optimum contribution to the litigation, and a reduction in merits-based competition among firms to represent the lead plaintiff.[28]

These concerns have continued to be expressed since adoption of the Act. For example, in *Milestone*, 183 F.R.D. 404 (D.N.J. 1998), the court stated that lead plaintiff had "not delineated any specific responsibilities for" counsel and "not shown how the benefits derived from appointing multiple lead counsel outweigh the complications and increased costs and expenses associated with the 'litigation by committee' approach." *Id.* at 419. The court reserved decision on the counsel motion, stating that lead plaintiff "must proffer sufficient justification, factual and legal, for the approval of multiple lead counsel." *Id.*[29]

---

**27.** *See, e.g., Percodani v. Riker–Maxson Corp.*, 51 F.R.D. 263, 265 (S.D.N.Y.1970) ("this Court sees no reason to saddle the plaintiff class with the burden of additional counsel fees and the added confusion which the appointment of co-lead counsel would bring"), *aff'd*, 442 F.2d 457 (2d Cir.1971); *Wells Fargo*, 157 F.R.D. at 468 ("Because a well-advised class in this case would seek to avoid unnecessary duplication of effort, the court earlier decided that only one firm should be selected to represent the class."); *Ballan*, 159 F.R.D. at 491 (court "expect[s] co-lead counsel to satisfy [it] that the remaining plaintiff had determined the class would not be burdened by any unnecessary expenses arising from the presence of a legion of lawyers"); *Housler v. First National Bank of East Islip*, 524 F.Supp. 1063, 1068 (E.D.N.Y.1981) (stating that if "the necessity for dual representation" of the class arose the court would inquire into "whether an appropriate understanding with all attorneys could be reached regarding the avoidance of duplication of effort"); *Bernstein v. Presidential Life Corp.*, 1993 WL 43559, at *2 (S.D.N.Y. Feb. 10, 1993) ("Co-Lead Class Counsel shall make all work assignments in such manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.").

**28.** *See, e.g., Wells Fargo*, 156 F.R.D. at 226 (the "common practice for plaintiff firms to join together *** to prosecute big cases *** effectively extinguishes competition among the plaintiff lawyers and therefore harms the interests of the class"); *In re Revco Secs. Litig.*, 142 F.R.D. 659, 670 (N.D.Ohio 1992) ("the presence of numerous counsel for the various plaintiffs" would "complicate the management of this case and waste judicial resources"); *Ballan*, 159 F.R.D. at 491 ("[e]ach of the firms designated as 'co-lead' counsel was quick to point the finger at someone else [about a mistake], and none assumed ultimate accountability"); John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working*, 42 Md.L.Rev. 215, 260–61 (1983).

**29.** *See, e.g., In re Donnkenny Inc. Secs. Litig.*, 171 F.R.D. 156, 158 (S.D.N.Y.1997) (allowing lead plaintiff to select two law firms as co-lead counsel "provided that there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorneys' fees and expenses"); *Cendant*, 182 F.R.D. at 151 (denying "all motions for appointment of liaison counsel" because "[q]ualified lead counsel will be surely capable of performing these ministerial tasks" and the court "finds no need to involve another law firm in this matter"); *Reiger v. Altris Software, Inc.*, 1998 U.S.Dist. LEXIS 14705, at *15–16, *18 (S.D.Cal. Sept. 11, 1998) (expressing concern that enlarging the number of lead counsel through appointment of "co-lead plaintiffs" could "unnecessarily increase the time and expense spent on preparing and litigating the case," where the presumptive lead plaintiff "already has three co-counsel" and "[a]ppointing [a co-lead plaintiff] would add two more counsel") (citation omitted); *Oxford*, 182 F.R.D. at 50 (appointing co-lead counsel "with the understanding that there shall be no duplication of attorney's services and that the use of [three] co-lead counsel will not in any way increase attorney's fees and expenses"; stating that "[t]he efforts of the Executive Committee [led by the co-lead counsel] are to be conducted economically and without duplication," delay of the progress of the litigation, or unnecessary enlargement of expenses); *In re Reliance Acceptance Group, Inc. Secs. Litig.*, 1998 WL 388260, at *5 (W.D.Tex. June 29, 1998) ("Counsel is warned, however, that there should be no duplication of services, and approval of three law firms should not be considered as a license to artificially inflate attorney's fees."); *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *7 (N.D.Ill. Aug. 11, 1997) (appointing two law firms as co-lead counsel, "provided that there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorneys' fees and expenses."); *King v. CBT Group PLC*, No. C–98–21014 RMW, Order at 1 (N.D.Cal. Jan. 28, 1999) (court "is reluctant to appoint three firms as co-lead counsel" and requests "an explanation of why all three firms" or a smaller number should be appointed).

C. *Courts Should Consider at the Outset of the Litigation the Appropriateness of Multiple Counsel.*

The Commission believes that it is appropriate, and in general necessary in terms of the effectiveness of the litigation effort, for this Court to address the foregoing concerns at the lead counsel selection stage. Some courts have suggested, however, that these concerns can be dealt with by alternative means. For example, in *Nager v. Websecure, Inc.,* 1997 WL 773717, at *1 (D.Mass. Nov. 26, 1997), the court stated that "[t]here should be no concern that duplicative legal efforts will result in higher legal costs to the class because the statute limits total attorneys' fees to 'a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.' " In *Zuckerman v. Foxmeyer Health Corp.,* 1997 WL 314422, at *2 (N.D.Tex. Mar. 28, 1997), the court dismissed concerns about multiple class counsel. It stated that "[a]s in any other litigation conducted in the Northern District of Texas, the attorneys for both sides are under a continuing obligation to comply with [a case establishing standards of litigation conduct to be observed in civil actions in the District] and the local Rules," citing Civil Justice Expense and Delay Reduction Plan and 28 U.S.C. 1927 ("Counsel's liability for excessive costs").

The Commission believes that the existence of other methods of addressing the issues of inefficiency, cost, and delay, does not warrant disregarding these issues at the time the court appoints counsel. These other methods are less effective than an approach that also includes evaluation of lead counsel proposals at the outset. No rule's dictate can completely overcome the inefficiency, added cost, and delay inherent in an inappropriate multiple counsel arrangement. And although, as was true prior to the 1995 Act, courts should review settlements and requests for attorneys' fees with rigor at the end of the litigation, early review will go far to avoid the problems with an inappropriate counsel arrangement. Post hoc review of a proposed settlement or attorneys' fee award is inevitably difficult and time-consuming,[30] and is no substitute for having in place an effective and efficient counsel arrangement in the first place.

For these reasons, the Commission believes that a lead plaintiff movant should provide the court with full information about its multiple counsel arrangement. The plaintiff should describe the lines of authority among the proposed co-counsel, the responsibilities and duties of each, and efforts it has made to avoid problems such as loss of direction of the litigation, duplication of effort, lack of coordination, and increase in costs. Where an "executive committee" of counsel is proposed, the court should inquire about plans for the use of additional counsel and the likely effectiveness of such plans.[31]

D. *In Evaluating Proposed Lead Counsel, Courts Should Consider the Nature of the Litigation, the Counsels' Resources and Expertise, the Circumstances Under Which a Group of Counsel Was Formed, and Conflicts of Interest, but Should Not Use Multiple Counsel as a Means of Assuring Diversity of Representation.*

The Court, in exercising its discretion to evaluate the multiple counsel proposal,

---

30. *See Milestone,* 183 F.R.D. at 419; *Horizon,* 3 F.Supp.2d at 1212–13 (court "reluctant to attempt a detailed, retroactive analysis of the work allocation made by lead counsel"); Jill E. Fisch, *Class Action Reform: Lessons from Securities Litigation,* 39 Ariz.L.Rev. 533, 553 (1997); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U.Chi.L.Rev. 1, 44–50 (1991).

31. One commentator has argued that courts should "encourage greater hierarchical control" within a committee of class counsel "so that the lead counsel, once selected, does not have to negotiate continuously with various constituencies, or to award them patronage in return for their votes." John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action,* 54 U.Chi.L.Rev. 877, 909 (1987). According to this view, "[o]nce freed of 'political' constraints, the plaintiffs' lead counsel could prune deadwood from the 'ad hoc firm' but could also invite in other attorneys and firms in order to achieve efficient risk-sharing." *Id.*

should carefully consider the nature, magnitude, and likely demands of the case. The lead counsel must have sufficient resources and flexibility to manage the litigation effectively for the class. It would thus be relevant whether the proposal includes "a large, well-financed firm plainly able to handle the litigation without the assistance of another firm" or instead consists of "two or more firms otherwise too small to take on class counsel responsibilities." *See In re Wells Fargo Secs. Litig.*, 156 F.R.D. 223, 226 (N.D.Cal.1994).

Where a court is less concerned about individual law firms' resources and where a number of plaintiffs' attorneys are available to provide any necessary assistance to lead counsel, appointment of fewer or a single lead counsel might be warranted. *See, e.g., Wells Fargo,* 156 F.R.D. at 227 (appointing one law firm as lead counsel and stating that the firm could "farm[ ] out work on the case to another law firm because of specialized knowledge, geographic proximity to witnesses or evidence or other comparative advantages, or even to spread risk"); *Malin v. Ivax Corp.,* No. 96–1843, Order at 8 (S.D.Fla. Nov. 1, 1996) (appointing two co-lead counsel with the "expect[ation] that counsel retained by the [lead plaintiff] will utilize the talents and expertise of the various firms who were retained by the other plaintiffs in this action in their position as lead counsel"). Of course, lead counsel should be able to explain to the court why and how the use of additional law firms promotes the effective, efficient prosecution of the litigation, rather than serving the interests of the law firms.

However, because the Reform Act is intended to "empower[ ] a unified force to control the litigation," *Milestone,* 183 F.R.D. at 417, the Commission believes that certain purported rationales for appointing multiple counsel are not valid. In one case, a magistrate judge seemed to suggest using the lead counsel provision as a back-door method of facilitating input from disparate class members that are not the lead plaintiff. *See Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 413 (D.Minn.1998). It might be suggested that the provision be used to avoid disputes over who should be lead plaintiff or to allow cooperating law firms to amass a large lead plaintiff "group."

The Commission believes that such an approach works at cross-purposes with the provisions for selecting the lead plaintiff. In particular, it risks introducing disunity and dissipating the ability of the lead plaintiff to control the litigation. Nor is there cause for it, because only a group that is properly constituted should be appointed lead plaintiff and that lead plaintiff has, by virtue of the Act's requirements, already been determined by the court to adequately represent the class. This does not mean, however, that lead counsel should not establish some mechanism for communication with members of the class other than the lead plaintiff; it merely means that assuring input or avoiding competition does not justify appointment of additional class members as lead plaintiffs or law firms as lead counsel.

The Commission also questions whether "it seems sensible to employ the [lawyer] 'committee' approach to minimize the potential for disputes about the direction of the litigation." *Nager,* 1997 WL 773717, at *1. An important purpose of the Act was to allow the lead plaintiff to direct the litigation. Any disputes over the direction of the litigation should be resolved by the lead plaintiff, and may merely be exacerbated if the lead plaintiff has to deal with disparate and contentious multiple lead counsel. The goals of the Act should not be subordinated to the desire to avoid or minimize disputes among counsel. Indeed, a key goal of the Act was to lessen the influence of counsel in the process of selecting lead plaintiff and lead counsel.

Another important consideration in evaluating the multiple counsel proposal is the possibility that a conflict of interest, or other inappropriate factor, may intrude into the choice of counsel. If circumstances justify particular confidence in the lead plaintiff's independence and ability to choose counsel, deference to those choices would be appropriate.

Where, however, it appears that the prospective lead plaintiff has not played an active, effective role in choosing counsel or the relationship between the plaintiff and one or

more of its chosen law firms is based on factors other than the merits of the firms, greater scrutiny is clearly warranted. For example, a law firm conceivably could make large political contributions to a decision maker at a prospective lead plaintiff which thereafter is appointed lead plaintiff; this would clearly warrant scrutiny from the court. *See* Elliott J. Weiss, *The Impact to Date of the Lead Plaintiff Provisions of the Private Securities Litigation Reform Act*, 39 Ariz.L.Rev. 561, 572 (1997) ("Weiss").[32] Thus, while deference to the lead plaintiff's judgment may be appropriate where it is capable of managing the litigation, and has acted in a manner that best serves the class' interests, blanket deference is not.[33]

The Court might find it useful in this regard to consider the relationship between each proposed counsel and the lead plaintiff and the circumstances under which that relationship was formed. Absent concerns about litigation skills, experience, or resources, a single law firm or cohesive team of firms representing a single client is likely to provide more effective representation than an ad hoc collection of firms assembled during the course of the litigation that represent (or represented) separate parties. Where a court has concerns about a multiple counsel arrangement, the court might therefore consider limiting lead counsel to the firm or firms representing the lead plaintiff at the outset of the litigation. This would be consistent with Congress' desire that the class benefit from the ways in which the lead plaintiff chooses, and negotiates with, its own counsel. *See Cendant*, 182 F.R.D. at 148 ("Indeed, one of the assumptions underlying the Reform Act's presumption of adequacy is that plaintiffs with the assets necessary to have made large investments will also be able to negotiate the most advantageous counsel rates to the class.").[34]

For example, a number of law firms might come together during the process of applying for, or competing for, lead plaintiff status. In *LaPerriere v. Vesta Insurance Group, Inc.*, No. 98–AR–1407–S (N.D.Ala., Acker, J.), a large proposed lead plaintiff group

---

**32.** In pre-Reform Act cases, most courts demanded a substantial degree of independence between the class representative and class counsel: they could not be members of the same family, business associates, or employer-employee, and class counsel could not belong to the class, lest counsel be tempted to use attorney fees to maximize their personal recoveries from the lawsuits. *See, e.g., Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 105 (5th Cir.1978); *Graybeal v. American Savings & Loan Ass'n*, 59 F.R.D. 7, 13–14 (D.D.C.1973). Of course, courts have also rejected class attorneys who had various relationships with the defendants, such as employment, or who were litigating against the defendants or class members in another case. *See, e.g., Lewis v. National Football League*, 146 F.R.D. 5, 10–12 (D.D.C.1992); *Bachman v. Pertschuk*, 437 F.Supp. 973, 975–76, 978 (D.D.C. 1977); *see also* 15 U.S.C. 78u–4(a)(9) ("If a plaintiff class is represented by an attorney who directly owns or otherwise has a beneficial interest in the securities that are the subject of the litigation, the court shall make a determination of whether such ownership or other interest constitutes a conflict of interest sufficient to disqualify the attorney from representing the plaintiff class.").

**33.** *See Horizon*, 3 F.Supp.2d at 1211 n. 1, 1212 (contrasting "consortium" that "was constructed largely by counsel seeking the lead role in the litigation" with the Reform Act "model" of "shareholders who possess a sufficient financial interest in the outcome to maintain some supervisory responsibility over both the litigation and their counsel"); *Raftery v. Mercury Finance Co.*, 1997 WL 529553, at *2 (N.D.Ill. Aug. 15, 1997) (expressing concern about lead plaintiff movant's retainer agreement with law firm because "the court suspects that [it] is not the result of hard bargaining," not the product of "a discerning client in an arms length negotiation with well-qualified counsel").

**34.** *See also* Weiss & Beckerman, 104 Yale L.J. at 2058, 2106–07 (arguing that having institutions as lead plaintiffs "would allow market forces, not courts, to play a dominant role in determining who served as plaintiffs' lead counsel in class actions, how lead counsel would be compensated, and the settlement terms that counsel for the plaintiff class would be inclined to propose" because "plaintiffs' attorneys frequently would find themselves competing to be retained by institutional investors" and institutions would be "in a position to negotiate fee arrangements with plaintiffs' lawyers before class actions are initiated"); Weiss, 39 Ariz.L.Rev. at 563 (stating that institutions are "likely to negotiate fee arrangements that more closely aligned the interests of plaintiffs' attorneys with those of the plaintiff class than do the fee structures that courts generally employ").

originally requested approval of two firms as "co-lead counsel." When it joined with a second "group" to compete with an institution to be lead plaintiff, it increased, without explanation, the number of proposed co-lead counsel to three firms, adding the firm representing the second group. Ultimately, the institution negotiated with three members of the large group a joint lead plaintiff proposal, providing for two firms as lead counsel, which the court accepted. This suggests that unless there has been active, effective client participation in the process, it is possible that the counsel arrangement may simply reflect bargaining among lawyers for their own stake in the case, and not serve the best interests of the class.[35]

Finally, if the Court determines that it is appropriate under the circumstances to appoint multiple lead counsel, the Court should condition their appointment on there being no duplication of attorney services or increase in attorneys' fees and expenses. The Court should also reserve the right to alter the counsel structure if it finds that the litigation is being delayed, that expenses are being unnecessarily incurred, or if the structure proves otherwise detrimental to the best interests of the proposed class. The Court might also find it useful to require the submission of itemized, periodic reports detailing the services rendered, the costs expended, and the hourly charges reasonably incurred in the litigation. *See Oxford,* 182 F.R.D. at

50; *Fisher Brothers v. Cambridge–Lee Indus., Inc.,* 1987 WL 26480, at *3 (E.D.Pa. Nov. 30, 1987).

*CONCLUSION*

For the foregoing reasons, the Commission believes that the Court should limit the proposed lead plaintiff "group" to a size capable of effectively managing the litigation and supervising counsel. The Commission further believes that the Court should actively exercise its discretion to review the multiple lead counsel proposal for the protection of the class. In the Commission's view, the Court should conduct that review based on careful attention to the facts of this case and in accordance with the considerations discussed in this memorandum.

Respectfully submitted,
HARVEY J. GOLDSCHMID
General Counsel
ERIC SUMMERGRAD
Deputy Solicitor
LUIS de la TORRE (D.C. Bar #435898)
Attorney
Securities and Exchange Commission
450 5th Street, N.W.
Washington, D.C. 20549-0606
(202) 942-0813 (de la Torre)
Dated: March 19, 1999

---

**35.** Practices described in various cases and commentaries pre-dating the Reform Act could still be at work behind some multiple class counsel proposals and work assignments by those counsel. *See Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1277 (3d Cir.1994) (noting that "[t]he lead attorney position is coveted as it is likely to bring its occupant the largest share of the fees generated by the litigation" and defense counsel's "expla[nation] that in class actions additional complaints are generated so that the original attorney will have allies when a vote is taken to determine the lead attorney"); Alexander, 43 Stan.L.Rev. at 528–29 n. 117 ("Some state court filings appear to be motivated primarily by strategic considerations in the intramural relations between plaintiffs' attorneys. For example, an agreement to stay the state action while the federal action proceeds *** may depend on whether the lawyers who filed in state court are satisfied with their role in the federal case."); Coffee, *The*

*Regulation of Entrepreneurial Litigation,* 54 U.Chi.L.Rev. at 908 (selection of class counsel could resemble "the legal equivalent of an unsupervised political convention ***. Rival slates would form. Competing groups would invite other attorneys into the action in order to secure their vote for lead counsel. Eventually, a political compromise would emerge. The price of such a compromise was often both overstaffing and an acceptance of the free-riding or marginally competent attorney, whose vote gave him leverage that his ability did not."); Coffee, *Rescuing the Private Attorney General,* 42 Md.L.Rev. at 250 ("The centrality of lead counsel's role means that there is often a spirited contest to determine who will occupy this position. In a major case, the process can resemble a political convention: vote-trading occurs, compromises are struck, and promises of favorable work assignments are made in return for support.").