**In re BAAN COMPANY SECURITIES LITIGATION**

**This Document Relates to All Actions**

**No. 1:98CV2465 (ESH).**

United States District Court, District of Columbia.

March 28, 2002.

**4**

Andrew Neil Friedman, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Joshua H. Vinik, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, for Laure Salerno.

Leslie Gordon Fagen, Lewis Farberman, pro hac vice, Daniel J. Leffell, pro hac vice, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Tom C. Tinsley.

Lee S. Shalov, Cary L. Talbot, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Ralph M. Stone, Shalov, Stone & Bonner, L.L.P., New York City, for plaintiffs' Co-lead Counsel.

Leslie Gordon Fagen, Lewis Farberman, pro hac vice, Daniel J. Leffell, pro hac vice, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Baan Co., N.V., Klass Wagenaar, William O. Grabe, David C. Hodgson, Amal M. Johnson.

Saul Murray Pilchen, Andrew L. Sandler, Colleen Patricia Mahoney, Stephen Paul Baughn, Andy Gene Rickman, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for Jan Baan, J.G. Paul Baan.

Jeffrey Steven Jacobovitz, Robert A. Jaffee, Kutak Rock, Washington, DC, Robert James Symon, Frank Leone, Jr., Spriggs & Hollingsworth, Washington, DC, William K. Holmes, Melvin G. Moseley, Jr., Warner Norcross & Judd LLP, Grand Rapids, MI, for Vanenberg Ventures, B.V.

Scott William Muller, Davis, Polk & Wardwell, Washington, DC, for MCI Communications Corp., Gerald H. Taylor, Timothy F. Price, Daouglas L. Maine, Bert C. Roberts, Jr., David M. Case.

Luis De La Torre, S.E.C., Washington, DC, for Securities and Exchange Com'n

## *MEMORANDUM OPINION*

HUVELLE, District Judge.

Plaintiffs have renewed their motion to certify a class consisting of all persons or entities that purchased or otherwise acquired Baan Company N.V. ("Baan") securities between January 28, 1997 and October 12, 1998. Plaintiffs have limited members of the putative class to those persons or entities that (1) are current residents of the United States; (2) were residents of the United States when they acquired Baan securities; or (3) purchased such securities within the United States.[1] Defendants Baan, Amal M. Johnson, Tom C. Tinsely, N.M. Wagenaar, William O. Grabe, David C. Hodgson, Vanenburg Ventures B.V. ("Vanenburg"), Jan Baan, and J.G. Paul Baan oppose class certification on two grounds. First, defendants contend that the five proposed class representatives are not adequate, in violation of Fed.R.Civ.P. 23(a)(4) and the Private Securities Litigation Reform Act of 1995 ("PSLRA" or the "Reform Act"), 15 U.S.C. §§ 78u–4, 78u–5. Second, defendants argue that the proposed class is overbroad and conflicted, and therefore it cannot be certified as currently defined. Based on consideration of the pleadings and the entire record, the Court concludes that plaintiffs have yet to sustain their burden under the PSLRA, and because

---

**1.** Plaintiffs have excluded from the proposed class purchasers who obtained Baan securities on a foreign exchange and resided abroad at that time, even if they subsequently moved to the United States. (Pl. Reply at 33.) Also excluded from the class are defendants; the officers and directors of defendants; members of the immediate families of defendants; any person, firm, trust, corporation, partnership, officer, director, or other individual or entity in which any excluded person has a controlling interest or which is related to or affiliated with any excluded person or entity; and the legal representatives, heirs, successors-in-interest, and assigns of any excluded person or entity. (Pl. Mem. at 1.)

this securities class action cannot proceed until the requirements of that statute are satisfied, plaintiffs' motion for class certification must, at this time, be denied without prejudice.

## BACKGROUND

This is a consolidation of seven purported class action suits that were brought against Baan after the company, a provider of enterprise business software solutions, announced on October 12, 1998 that it would suffer a substantial loss during the third quarter of that year.[2] All of these cases were assigned to the undersigned on June 7, 2001, after the retirement of the Honorable Joyce Green, who had presided over these matters since their inception. The procedural road to this point has been arduous and lengthy. However, before addressing the problems that have beset this case, this action must be considered within the broader context of the PSLRA and Congress' efforts to regulate securities class actions.

## I. Statutory Framework

The PSLRA was enacted by Congress in 1995 to respond to "perceived abuses in ... private securities class actions." *In re Network Assocs. Securities Litigation,* 76 F.Supp.2d 1017, 1018 (N.D.Cal.1999). As Judge Green noted in an earlier opinion in this action, the primary purpose of the PSLRA is to ensure that clients, rather than lawyers, drive securities class actions. "Congress, in the PSLRA, altered the procedures for bringing class actions under the federal securities laws". Congress' principal focus, as reflected in the legislative history, was that plaintiff investors, and not their counsel, make the ultimate strategic decisions in litigation. *In re Baan Company Securities Litigation,* 186 F.R.D. 214, 215 (D.D.C.1999) [hereinafter *Baan I* ].

To achieve this goal, the PSLRA created the position of "lead plaintiff." 15 U.S.C. § 78u–4(a)(3). As Judge Green explained,

> The PSLRA directs the Court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class." The Act creates a "rebuttable presumption that the most adequate plaintiff" is the person or group of persons that (aa) has either filed the complaint or made a motion in response to a notice; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. The presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately represent the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class". Finally, the PSLRA states that "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."

*Baan I,* 186 F.R.D. at 216 (internal citations omitted). "From a legal perspective, however, the actual duties of the lead plaintiff are largely unspecified. All that is made clear by the PSLRA is that the most adequate plaintiff 'shall ... select

---

**2.** The seven actions were *Salerno v. Baan Company N.V.,* Civil No. 98–2465; *Gladstone v. Baan Company N.V.,* Civil No. 98–2532; *Silver v. Baan Company N.V.,* Civil No. 98–2542; *Diers v. Baan Company N.V.,* Civil No. 98–2610; *Belmont v. Baan Company N.V.,* Civil No. 98–2659; *Grossmann v. Baan Company N.V.,* Civil No. 98–2880; and *Zemella v. Baan Company N.V.,* Civil No. 98–3038.

and retain counsel to represent the class ....'" (Pl. Reply, Ex. 6, John C. Coffee, Jr., "What Should A Lead Plaintiff Do?" *New York Law Journal,* Jan. 17, 2002, at 1.)

Under the statute, the court appoints the lead plaintiff, 15 U.S.C. § 78u–4(a)(3)(B)(i), and must approve the lead counsel who is chosen by the lead plaintiff. *Id.* § 78u–4(a)(3)(B)(v). The court is also empowered to review these appointments *sua sponte. In re Waste Management, Inc. Securities Litigation,* 128 F.Supp.2d 401, 410 (S.D.Tex.2000); *Takeda v. Turbodyne Technologies, Inc.,* 67 F.Supp.2d 1129, 1138 (C.D.Cal.1999).

## II. Factual Background

### A. The Parties

Founded by defendant Jan Baan in 1978, Baan is an international provider of enterprise business management software, with dual executive and corporate headquarters located in Virginia and Holland. (Amended Complaint ¶¶ 14–15.) Baan serves over 6,300 customers at more than 12,000 sites worldwide. (Def. Opp. at 5.) The five proposed class representatives—Ralf Hirschmann, Frances and Charles Cipriano, Terry Herron, and Daniel De-Jongh—each acquired shares of Baan stock during the relevant time period and suffered financial losses as a result.

The amended complaint alleges eight defendants in addition to Baan. According to the complaint, defendant Jan Baan served as the chief executive officer of Baan until July 1998 and as managing director at all relevant times.[3] (Amended Complaint ¶ 15.) Defendant Tinsley joined Baan in November 1995 as managing director, president, and chief operating officer, became chair of the board of managing di-

rectors in April 1998, and replaced Jan Baan as CEO in July 1998. (*Id.* ¶ 16.) Defendant Wagenaar became the senior vice president and chief financial officer of Baan in August 1997, and replaced Tinsley as chief operating officer in April 1998. (*Id.* ¶ 17.) Defendant Paul Baan, who is Jan Baan's brother, joined Baan in 1982 and was named chief operating officer in 1994. He was appointed vice chairman and managing director in January 1995 and president in October 1995, but resigned from those positions in April 1996, when he became chairman of the supervisory board, an office he held until December 1997. (*Id.* ¶ 18.)

The other four defendants are tied to Baan through its shareholders and subsidiaries. Defendants Grabe and Hodgson are managing directors of General Atlantic Partners ("GAP"), which was a Baan shareholder, and became supervisory directors of Baan in May 1995, with Grabe serving as chairman of Baan's board of supervisory directors until April 1996. (*Id.* ¶¶ 19–20.) Defendant Johnson became president of the Baan subsidiary Baan U.S.A., Inc. in 1994, and took over as managing director and "executive vice president, Baan Affiliates & Marketing" in January 1997. (*Id.* ¶ 21.) Plaintiffs allege that Grabe, Hodgson, and Johnson all sold Baan securities while in possession of material inside information. (*Id.* ¶¶ 19–21.) The final defendant is Vanenburg, an entity controlled by Jan and Paul Baan. Vanenburg is alleged to have owned 25% of the common shares of Baan and 85% of Baan Midmarket Solutions ("BMS"), a company formed by Vanenburg and Baan in 1997. Plaintiffs allege that Baan perpetrated fraud through BMS and other related parties. (*Id.* ¶ 23.)

---

**3.** The allegations in the complaint are presumed true for purposes of a motion for class certification. *In re MDC Holdings Securities*

*Litigation,* 754 F.Supp. 785, 800 (S.D.Cal. 1990); *Harman v. LyphoMed, Inc.,* 122 F.R.D. 522, 524 (N.D.Ill.1988).

## B. Baan During the Class Period

At all times relevant to this action, Baan stock traded primarily on the Amsterdam Stock Exchange, as well as on the Frankfurt Stock Exchange, and since May 1995, on the NASDAQ National Market System. (*Id.* ¶ 14.) The price of Baan stock fluctuated dramatically during the class period: the NASDAQ price rose from $17½ to $40½ between January and July 1997, then dropped by more than 25% in two months, falling to $29⅞ on September 16, 1997. The stock rose and declined similarly through the end of 1997 and early 1998, reaching its peak of $54⅛ on April 20, 1998, and then dropping to $25⅝ by September 30 and $17⅞ by October 11 of that year. (Def. Opp. at 6.)

The cause of Baan's stock drop is a matter of dispute. Defendants attribute its erratic behavior to the fact that it was a technology company, and thus its stock prices are "known to be volatile." *Baan I,* 186 F.R.D. at 218. They note that the stock prices of Baan's competitors exhibited a similarly mercurial pricing pattern during the relevant period of 1997 and 1998. (Declaration of Daniel J. Leffell ("Leffell Decl."), Ex. 1.)

Conversely, plaintiffs allege that throughout the class period, defendants made material misrepresentations about Baan's financial health, including its profitability, business growth, success over its competitors, and compliance with accounting practices. Specifically, plaintiffs contend that defendants recognized tens of millions of dollars in revenue in connection with sales which, unbeknownst to investors, were nothing more than shipments of merchandise to Baan-related parties on consignment. According to plaintiffs, Baan's revenue for 1997 was exaggerated by 100% by virtue of this fraudulent practice alone. (Amended Complaint ¶ 2.) This, in turn, caused the artificial inflation of Baan's stock price, while also violating United States generally accepted accounting principles ("GAAP"). (*Id.* ¶¶ 4, 6.)

Plaintiffs assert that Jan and Paul Baan, through defendant Vannenberg, used a substantial amount of Baan common stock as security to obtain approximately $500 million in loans. These loans were funneled to Baan as working capital through informal cost sharing arrangements and payments made in connection with purported sales by Baan to Vannenberg. (Amended Complaint ¶ 7; Pl. Mem. at 6.) Plaintiffs contend that Vannenberg's creditors ultimately forced it to sell 18 million of the Baan shares that it had secretly pledged in connection with this loan. (Pl. Mem. at 6–7.)

During the class period, plaintiffs allege that defendants took advantage of inside information about the inflated price of Baan stock to sell more than 130,000 shares for over $5.6 million. (Amended Complaint ¶ 7.) Entities controlled by two of the defendants sold 559,959 Baan shares for $25 million, and other senior Baan executives sold more than 224,000 Baan American Depository Receipts ("ADRs") for more than $6 million.

On October 12, 1998—the last day of the class period—Baan announced that it would suffer a loss during the third fiscal quarter of 1998, after thirteen consecutive quarters of market gains. (*Id.* ¶ 8; Def. Opp. at 6.) The Company revealed that, instead of earning $0.15 as it had forecast, Baan would lose up to $0.16 per share for the third quarter, and it warned that the fourth quarter would be even worse. (Amended Complaint ¶ 9.) Baan attributed the loss to three factors—global economic conditions, market volatility, and a reallocation of customers' technology budgets to Y2K issues. (Def. Opp. at 6.) That day, the price of Baan stock on NASDAQ dropped from $17⅞ to $13½. (Amended Complaint ¶ 9.) The price of Baan stock

also fell in Europe, dropping 28% on the Amsterdam and German exchanges. (*Id.*)

## III.  Procedural History

### A.  The Complaint

Within days of the Company's announcement, six law firms commenced four proposed class actions against Baan and others. By mid-December 1998, ten law firms had filed seven putative class actions related to the drop in Baan's stock price. Six of the complaints purported to be on behalf of purchasers of Baan securities between January 30, 1998 and October 12, 1998. The seventh covered purchasers of Baan stock for an additional year—from January 28, 1997 to October 12, 1998.

In an Order dated February 16, 1999, Judge Green consolidated the seven cases into the instant action. The consolidated complaint, which was filed on April 22, 1999, alleges securities fraud under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, and control person liability under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

### B.  Appointment of Lead Plaintiffs and Lead Counsel

#### 1.  Lead Plaintiffs

On December 15, 1998, eight of the ten law firms that had commenced the original lawsuits, joined by two new firms, moved for appointment of lead plaintiffs and counsel pursuant to the PSLRA. The motion sought to have 20 of the 466 members of the "Baan Shareholder Group"[4] appointed as lead plaintiffs, and requested the designation of five firms as lead counsel and liaison counsel. Proposed as lead counsel were Abbey, Gardy & Squitieri LLP; Milberg Weiss Bershad Hynes & Lerach LLP; Berger & Montague, P.C.; and Shalov Stone and Bonner; nominated as liaison counsel was Cohen Milstein Hausfeld & Toll, P.L.L.C.

Although the motion to appoint lead plaintiffs and counsel was unopposed,[5] Judge Green deferred ruling, and instead, in her February 16, 1999 Order, invited the SEC to submit an *amicus curiae* brief on the issue. After considering the SEC's submission, on April 12, 1999, the Court denied without prejudice the motion for the appointment of lead plaintiffs and counsel. *Baan I*, 186 F.R.D. at 218. Judge Green rejected the notion that an aggregated group of unrelated shareholders, formed to artificially accumulate the "largest financial interest" in the action, 15 U.S.C. § (a)(3)(B)(iii)(I)(bb), was a suitable lead plaintiff under the statute. Relying in part on the SEC's *amicus* brief, the Court determined that "where unrelated investors are to be Lead Plaintiff, a triumvirate is preferable. . . . [T]his Court's experience with class actions . . . teaches that a small committee will generally be far more forceful, effective, and efficient than a larger aggregation. The Lead

---

4. The record sheds little, if any, light on the genesis of the "Baan Shareholder Group." From that group, the initial proposed lead plaintiffs were Said Alexane, Emmett Beard, Roger and Andrea Bruderlin, Waylee Chen, Frances and Charles Cipriano, G.J. DeBoer, John Diers, Janet Easland, Wojciech Glodkiewicz, Glen Holman, Walter Lem, Wolfgang Weidmann, Peter von Muralt, David Tyler, William Kyle, Laure Salemo, Rob Slagboom, and Aaron Williams. Only two of these individuals—Diers and Salerno—were named plaintiffs in the original lawsuits.

5. This is expected under the PSLRA, since only putative class members—and not defendants—may challenge the appointment of lead plaintiffs and counsel. *See In re Cendant Corp. Litigation*, 264 F.3d 201, 268 (3d Cir. 2001); *Waste Management*, 128 F.Supp.2d at 409; *Takeda*, 67 F.Supp.2d at 1138.

Plaintiff decision should be made under a rule of reason, but in most cases three should be the initial target, with five or six as the upper limit." *Baan I*, 186 F.R.D. at 217.

Judge Green also emphasized the special importance of the lead plaintiff appointment in this action.

> The facts of this case raise another consideration favoring a strong Lead Plaintiff. As with many securities class actions filed after passage of the PSLRA, this involves a high technology company. The vast majority of the Baan Shareholder Group have relatively small holdings. As a result, it is likely that Lead Counsel will have a greater financial stake in this litigation than any of the individual plaintiffs. That may give rise to certain tensions.

*Id.* (internal citation omitted). The Court then denied without prejudice plaintiffs' motion to appoint the 20–member group as lead plaintiff, and instead proposed that the three individuals in the Baan Shareholder Group with the largest losses, according to a chart submitted by plaintiffs, may be the most adequate lead plaintiffs under the statute. *Id.* at 218. The Court directed counsel for the three individuals—Werner Hitzel, Peter Von Muralt, and Wolfgang Weidmann—to address whether they should be appointed lead plaintiffs pursuant to the requirements of the PSLRA. *Id.* at 217–18.

On April 21, the same ten law firms moved for the appointment of three new lead plaintiffs. In addition to Weidmann, counsel sought the appointment of Eva Wulf and Ralf Hirschmann in place of Hitzel and Von Muralt.[6] Weidmann, Wulf, and Hirschmann were all foreign residents. (Pl. Mem. In Further Support at 3.) However, while both Weidmann and Wulf purchased all of their Baan stock on foreign exchanges, Hirschmann had traded Baan shares in the United States and was, according to plaintiffs, "the individual with the largest estimated loss based on purchases of Baan shares on [ ] NASDAQ."[7] (*Id.*)

The memorandum submitted by plaintiffs in support of that motion proffered that the three individuals would adequately represent the interests of the putative class and understood their obligations as lead plaintiffs, and the Court granted the motion based on those representations. Several of plaintiffs' statements are noteworthy.

> ! "Each of these individuals is aware of his and her obligations as proposed Lead Plaintiffs, *including the decision-making authority vested in them.*" (*Id.* (emphasis added).)

---

6. Hitzel was removed because he actually lost far less money than was reflected on the spreadsheet. Von Muralt was replaced to create a spot for Hirschmann. (Pl. Mem. In Further Support Of Motion To Appoint Lead Pls. ("Pl. Mem. In Further Support") at 3.)

7. In fact, it appears that Hirschmann was the person with the largest estimated loss from the decline in stock price on the NASDAQ of the 466 members of the "Baan Shareholder Group." The Court, however, does not have any information regarding the financial losses allegedly suffered by the "thousands" of other putative class members. (Amended Complaint ¶ 150.) Of course, as discussed *infra*, many of the members of the Baan Shareholder Group are no longer included within the putative class, because they are foreign residents who bought Baan shares on foreign exchanges. And most of those remaining suffered losses of less than $20,000. (*See* Pl. Motion For Appointment Of Lead Plaintiffs, Ex. A.) While Hirschmann's losses totaled approximately $107,000, these were still significantly less than those of Weidmann or Wulf. Weidmann suffered an estimated loss of $566,000, and Wulf lost approximately $317,000. (Pl. Mem. In Further Support at 3 nn. 2–4.)

! "There are no pre-existing relationships among these proposed Lead Plaintiffs. These individuals have agreed to serve and work as a committee of lead plaintiffs and to work with lead counsel in the interests of the Class, and they understand the role and responsibilities of serving as lead plaintiffs." (*Id.* at 4.)

! "These proposed Lead Plaintiffs, and their proposed co-lead counsel, in association with the law firm Rotter Rechtsanwalte, have developed and agreed to follow a plan for holding regular conference calls at regular intervals to discuss the case as it progresses and at all major thresholds, and to ensure the involvement of the Lead Plaintiffs in the decision-making process." (*Id.*)

The nine-page brief was signed by an attorney at Cohen, Milstein, proposed liaison counsel, and submitted by a total of eleven law firms, including the four proposed lead counsel and six additional attorneys for plaintiffs.

The following day, Judge Green provisionally approved the appointment of these three individuals as lead plaintiffs, but reserved "the right to revisit this ruling should circumstances in the litigation so warrant." *In re Baan Company Securities Litigation,* 186 F.R.D. 214 (D.D.C. 1999).

### 2. Lead Counsel

The April 22 Order also required the lead plaintiffs to propose lead counsel, but specified that if more than one firm were to be suggested, "such proposal must be supported by a detailed justification." *Id.* On May 10, 1999, the lead plaintiffs moved for appointment of lead counsel. Although only Weidmann was among the 20 lead plaintiffs originally proposed by the Baan Shareholders Group, the three lead plaintiffs suggested the same five law firms that had previously been rejected. In support of the motion, the lead plaintiffs submitted a signed declaration in which they identified the four proposed lead firms, noting that "[c]ounsel have committed to us that they will keep us advised as to the status of the case on a regular basis, and confirmed to us that we will act as final decision-makers during the course of the litigation." (Decl. In Support Of Lead Pls. Mot. For Appointment Of Lead Counsel ¶ 2.) Despite counsel's arguments that four lead firms were justified by the complex and international nature of the case, Judge Green denied the motion in a May 19, 1999 Order. "The Court is of the view that it would be in the best interests of the class if no more than two firms act as Lead Counsel, with a third playing the role of liaison counsel. This arrangement will allow the distant Lead Plaintiffs, who also have their own domestic representation, to better control the litigation and will better ensure that duplication of effort is avoided." *In re Baan Company Securities Litigation,* Civil No. 98–2465, Order, at 1 (D.D.C. May 19, 1999).

Judge Green asked plaintiffs to submit a proposal for two of the four firms to serve as lead counsel. On June 1, 1999, the Court approved plaintiffs' request that Milberg Weiss and Shalov Stone be appointed lead counsel. Although under the PSLRA the lead counsel is retained "to represent the class," 15 U.S.C. § 78u–4(a)(3)(B)(v), Judge Green noted that "[l]ead counsel may enlist other counsel to assist in specific tasks where such counsel have superior expertise or where such delegation is otherwise justified." *Baan,* May 19, 1999 Order at 1–2.

### C. Dismissal of the Claims of Two of the Three Lead Plaintiffs

On April 22, 1999, plaintiffs filed their amended complaint, which purported to be on behalf of a class of individuals who purchased Baan securities between Janu-

ary 28, 1997 and October 12, 1998. Defendants moved to dismiss the amended complaint on August 4, 1999, in part on the ground that the court lacked subject matter jurisdiction over claims asserted by foreign residents who purchased Baan shares on foreign markets. In a June 21, 2000 Opinion, Judge Green dismissed the claims of those plaintiffs "who neither reside in the United States nor made their stock purchases in the United States." *In re Baan Company Securities Litigation*, 103 F.Supp.2d 1, 25 (D.D.C.2000) [hereinafter *Baan II* ]. As a result, the claims of two of the three lead plaintiffs—Weidmann and Wulf—were dismissed, leaving Hirschmann as the sole remaining lead plaintiff.[8]

**D. Subsequent Procedural History**

On September 29, 2000, plaintiffs filed a motion for class certification. Plaintiffs proposed a group of seven class representatives—Hirschmann, Charles and Francis Cipriano, Terry Herron, Daniel B.C. de Jongh, Glen Holman, and J.R. Krishnadath.[9] Not one of the proposed representatives was among the original named plaintiffs, and only the Ciprianos and Holman were among the 20 individuals originally proposed as lead plaintiffs.

On December 12, 2000, Judge Green struck the class allegations of the amended complaint for failure to comply with Local Rule 23.1(b), and denied the motion for class certification as moot.[10] *In re Baan Company Securities Litigation*, Civil No. 98–2465, Order (D.D.C. Dec. 12, 2000). However, on June 6, 2001, Judge Green granted plaintiffs' motion for reconsideration of the December 12 Order. She then denied defendants' motion for certification

of an interlocutory appeal of that decision. Plaintiffs subsequently renewed their motion for class certification.

**LEGAL ANALYSIS**

The appointment of a lead plaintiff is a prerequisite to the maintenance of any private securities class action. *See* 15 U.S.C. § 78u–4; *In re Oxford Health Plans, Inc. Securities Litigation*, 199 F.R.D. 119, 125 (S.D.N.Y.2001) ("[I]n the ordinary course of litigation the class representative will not appear on the scene until long after the lead plaintiff."). So although this case now comes before the Court in the posture of a motion for class certification, the adequacy of the lead plaintiff is an underlying issue. While the role of the lead plaintiff is not specifically defined in the statute, the legislative history makes clear that the lead plaintiff must do two things—select the lead counsel and control the litigation. As the House Conference Committee report explained, "[s]ubject to court approval, the most adequate plaintiff retains class counsel. As a result, the Conference Committee expects that the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff." H.R. Conf. Rep. 104–369, at *35 (1995). The Senate Committee report emphasized that the PSLRA was "intended to empower investors so that they, not their lawyers, control securities litigation ... [and to change the existing system, in which] investors in the class usually have great difficulty exercising any meaningful discretion over the case brought on their behalf.... [The PSLRA] contains several provisions to transfer primary control of private securi-

---

**8.** Neither Weidmann nor Wulf is a resident of the United States, and both purchased Baan shares during the class period on foreign exchanges. (*See* Pl. Mem. In Further Support.)

**9.** Holman and Krishnadath have since withdrawn as proposed class representatives.

**10.** Local Rule 23.1(b) states that "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action ... the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure, that the case may be so maintained."

ties litigation from lawyers to investors." S. Rep. 104–98, at *6 (1995).

This purpose—to ensure that these actions are driven by investors, rather than lawyers—has been reaffirmed repeatedly by courts across the country. *See, e.g., In re Cendant Corp.,* 260 F.3d 183, 197 (3d Cir.2001); *AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 218 (2d Cir.2000); *Baan I,* 186 F.R.D. at 215; *In re MicroStrategy Inc. Securities Litigation,* 110 F.Supp.2d 427, 435 n. 14 (E.D.Va.2000). Specifically,

> the lead-plaintiff provisions of the PSLRA create significant federal rights that previously did not exist. It can hardly be gainsaid that the right to steer litigation of this magnitude is an important privilege. The lead plaintiff's control over aspects of litigation such as discovery, choice of counsel, assertion of legal theories, retention of consultants and experts, and settlement negotiations gives the lead plaintiff decisional muscle that other members of the class lack.

*In re BankAmerica Corp. Securities Litigation,* 263 F.3d 795, 801 (8th Cir.2001). That the lead plaintiff exercise control over settlement is particularly critical in this action. As Judge Green explained,

> the majority of the Baan Shareholder Group—who have indicated that they are typical of the class—continue to hold their securities; their losses remain unrealized. Stock prices in the high technology sector are known to be volatile. Depending on their view of the market for the Company's product, and the market for the Company's stock, it may be in the class members' interest to settle

for less in this case to preserve the Company's viability, in the hope of reaping potential benefits from future increases in the stock price. Assuming the class shares a common interest in this regard, Congress envisioned that they would have a strong Lead Plaintiff who will assert that interest when making significant litigation decisions.

*Baan I,* 186 F.R.D. at 217–18.

■ As noted, the PSLRA operates under the presumption that the "person or group of persons" with the largest financial interest in the relief sought by the class is the "most adequate plaintiff," as long as they satisfy the requirements of Fed.R.Civ.P. 23. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff [ ] will not fairly and adequately protect the interests of the class ....." *Id.* § 78u–4(a)(3)(B)(iii)(II).[11] The determination of fair and adequate representation must be based on a showing by the lead plaintiff that he has, *inter alia,* a "willingness and ability to vigorously prosecute the action." *Piven v. Sykes Enterprises, Inc.,* 137 F.Supp.2d 1295, 1302 (M.D.Fla.2000).

■ In her April 22, 1999 Order appointing Weidmann, Wulf, and Hirschmann, Judge Green "reserve[d] the right to revisit this ruling should circumstances in the litigation so warrant." Given the unexpected turn of events that has resulted in Hirschmann being the only lead plaintiff, and in light of the evidence now presented concerning the direction and

---

**11.** Although the statute provides that the presumption may only be rebutted by proof offered by a member of the putative class that the proposed lead plaintiff is inadequate, the presumption does not apply until a court has found that the lead plaintiff is an adequate representative in the first place. *See* 15

U.S.C. § 78u–4(a)(3)(B)(iii); Fed.R.Civ.P. 23(a)(4). It is therefore appropriate under the statute for a court to examine the adequacy of a lead plaintiff *sua sponte. Waste Management,* 128 F.Supp.2d at 410; *Takeda,* 67 F.Supp.2d at 1138.

management of this lawsuit to date, the Court feels compelled to revisit that ruling.

Hirschmann has supposedly been in the role of lead plaintiff in this action for nearly three years. A review of the record reveals four aspects of the lead plaintiff position in this litigation that are troubling. First, the existence of a single individual as lead plaintiff explicitly contravenes Judge Green's thoughtful analysis, which led to her finding that "a triumvirate is preferable." *Baan I*, 186 F.R.D. at 217. Having only one person serve as lead plaintiff in a suit with two firms acting as lead counsel and a putative class of "thousands" (Pl. Mem. at 10) will, as suggested by Judge Green, hamper the ability of the lead plaintiff to be "forceful, effective and efficient." *Baan I*, 186 F.R.D. at 217.[12] Co-lead plaintiffs are particularly appropriate in a case such as this, in which it appears that there are "two or more smaller investors with roughly equal interests [and] no plaintiff with a significantly larger interest than all other plaintiffs." *Gluck v. CellStar Corp.*, 976 F.Supp. 542, 550 (N.D.Tex.1997).

For Hirschmann, geographic and linguistic barriers impose an additional challenge, as he lives in Germany and at times required a translator to answer questions at his deposition. (*See generally* Pl. Reply, Ex. 1, Deposition of Ralf Hirschmann ("Hirschmann Dep.").) Given the dictates of the PSLRA, the Court is reluctant to proceed with an individual foreign investor as the lone lead plaintiff. *See Network Assocs.*, 76 F.Supp.2d at 1030 (rejecting as lead plaintiff two foreign organizations because "they are distant. . . . The distances involved and some differences in business culture would impede their ability to manage and to control American lawyers conducting litigation in California. . . . The Court certainly does not say that a foreign investor could never qualify. But these factors, when added to the others set forth above, reinforce the Court's conclusion that neither [candidate] can fairly and adequate represent the class.").

Second, it appears that this lead plaintiff did not personally select the lead counsel in this action, which is the one task that the PSLRA specifically requires of him. At his deposition, Hirschmann testified that "me and other companies are being represented by Rotter in Munich and Shalov Bonner & Stone in New York." (Hirschmann Dep. at 83:3–5.) Hirschmann did not believe that Milberg Weiss was his attorney.

Q: Are you being represented by any other lawyers or law firms other than the Rotter firm and Shalov Stone & Bonner? . . . .

A: From what I heard there is also a law firm Milberg & Weiss.

Q: Do you know whether they represent you? . . . .

A: I cannot say that. For me, they are primarily the previously named two law firms.

---

**12.** Although the statute specifically contemplates the appointment of a single lead plaintiff, the legislative history indicates that this would most likely occur where the sole lead plaintiff is an institutional investor. "[B]y requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the 'most adequate plaintiff,'" the PSLRA was designed in part "to increase the likelihood that institutional investors will serve as lead plaintiffs." H.R. Conf. Rep. 104–369, at *34. Plainly, a single institutional investor, made up of numerous individuals with common interests, carries more weight as lead plaintiff with lead counsel and class members than does one individual. The absence of an institutional investor, however, does not mean that a securities class action is not possible, but rather, that the court may need to exercise greater vigilance in ensuring that the lead plaintiff and the lead counsel fulfill the expectations of the statute.

Q: You say "primarily." Do you know whether any other firms are representing you?

A: Well, I cannot say that I have named two other names, Milberg & Weiss, but—who are involved, but as far as representation goes, I am represented by these two firms, Rotter and Stone.

(*Id.* at 83:21–84:15.) Based on this exchange, Hirschmann appears not to have had any role in retaining the Milberg firm as lead counsel.

Third, the record demonstrates that, to date, this suit is not being conducted in a manner consistent with the spirit and intent of the PSLRA. Hirschmann's deposition is punctuated with comments that raise concerns as to whether the lead plaintiff, as opposed to the law firms, will have the ability or the incentive to control the litigation, as required by the PSLRA.

Q: Have you made any decisions during the course of this litigation? . . . .

A: Me? Decisions? No.

(*Id.* at 149:21–24.)

Q: Is part of your task as class representative to manage the litigation?

A: I have nothing to do with managing of litigation.

Q: Who is it who is responsible for controlling the litigation? . . . . If you know.

A: My lawyers.

Q: Anybody else?

A: I cannot imagine that.

Q: Is there anybody who is responsible for supervising the lawyers?

A: I cannot give you any position to that.

(*Id.* at 110:3–22.) Hirschmann also was unaware of a meeting between Shalov Stone and defense counsel "to determine whether the parties had an interest in exploring a possible resolution of the litigation . . . with each side agreeing that further discussions concerning a possible resolution at that time would not be fruitful." (Affidavit of Lee S. Shalov ("Shalov Aff.") ¶ 2; *see* Hirschmann Dep. at 111–12.) And it appears that the only documents related to the case that Hirschmann has seen are the declaration of lead plaintiffs in support of their motion for appointment of lead counsel and the amended complaint, which he spent "five minutes" looking at, and about which he made no suggestions to his attorneys. (Hirschmann Dep. at 99–100; 143–45; 147–48.) Ironically, the declaration relating to the appointment of lead counsel was signed by Hirschmann and written in support of Milberg Weiss, the firm that Hirschmann did not recognize as his counsel. Further, it is unclear from the record if the statements in that declaration that "counsel have committed to us that they will keep us advised as to the status of the case on a regular basis, and have confirmed that we will act as final decision-makers during the course of the litigation" (Decl. In Support ¶ 2) have been realized as of this time.

Tracing the evolution of the "plaintiff" in this action reinforces the conclusion that this suit has been driven by lawyers. Seven complaints were originally filed in this action by seven named plaintiffs and ten law firms. The amended and consolidated complaint was filed several months later by a group of 466 plaintiffs, which included only two of the original seven named plaintiffs, and eleven law firms. Twenty of these 466 plaintiffs were nominated as lead plaintiff, also including two of the original named plaintiffs. The Court rejected that proposal and instead suggested three other members of the Baan Shareholder Group, none of whom were the original named plaintiffs. Plaintiffs' five co-counsel then proposed a different set of three lead plaintiffs, including only one of the individuals suggested by the Court, and again including none of the original named plain-

tiffs. This proposal was accepted by the Court, which also subsequently approved the appointment of only two of plaintiffs' law firms as lead counsel. Next, the claims of two of the three lead plaintiffs were dismissed from the lawsuit for lack of subject matter jurisdiction, leaving only one remaining lead plaintiff. And now plaintiffs have moved to certify as class representatives that sole lead plaintiff, plus four other individuals—none of whom were original named plaintiffs, and only two of whom were among the twenty proposed lead plaintiffs. In sum, five of the seven individuals who filed lawsuits in the first place have literally disappeared from the face of this action. The one lead plaintiff who remains appeared from a spreadsheet several months after the lawsuit had been filed. And there has been absolutely no continuity among the "plaintiffs" during the course of this case: the plaintiffs who filed suit bear no resemblance to the lead plaintiffs, or to those individuals who seek to be certified as class representatives.

Rather, the only continuous thread has been the law firms—and especially the firm of Abbey, Gardy, which filed the first complaint, *Salerno v. Baan*, and appeared at the depositions of all five of the proposed class representatives.[13] In contrast, the two lead counsel—Milberg Weiss and Shalov Stone—failed to appear at any of the depositions except that of Hirschmann, at which Shalov Stone and Abbey Gardy were present. These actions appear to indicate that PSLRA's intent to both avoid lawyer-driven litigation and "the race to the courthouse to be the first to file the complaint," S. Rep. 104-98, at *10, may not have been realized.

Finally, Hirschmann, with lead counsel, has not fulfilled the representations made to the Court in plaintiffs' April 21, 1999 memorandum in further support of their motion for the appointment of lead plaintiffs. That document proferred that the lead plaintiffs were aware of "the decision-making authority vested in them" (Pl. Mem. In Further Support at 3), but Hirschmann testified that he has made no decisions regarding the litigation, and that managing the litigation was entirely the responsibility of his attorneys. (Hirschmann Dep. at 110, 149.) The April 21, 1999 memorandum stated that the lead plaintiffs had "agreed to serve and work as a committee of lead plaintiffs and to work with lead counsel in the interests of the Class, and [that] they understand the role and responsibilities of serving as lead plaintiffs" (Pl. Mem. In Further Support at 4), but Hirschmann testified that he had heard of neither Weidmann nor Wulf (Hirschmann Dep. at 148),[14] and had minimal contact with his attorneys since his

13. Plaintiffs attempt to explain away Abbey, Gardy's constant presence by noting that the firm "has been representing and communicating with proposed representative Daniel DeJongh, while the law firm of Berger & Montague, P.C. has been representing and communicating with the [other] proposed class representatives.... Accordingly, it was Lead Counsel's judgment that these firms should continue to represent these clients and defend them at their depositions." (Shalov Aff. ¶ 4.) That explanation, however, does not account for Abbey, Gardy's presence—and the absence of lead counsel—at the depositions of the Ciprianos and Herron, nor does it explain

Abbey, Gardy's attendance at Hirschmann's deposition.

14. Although Weidmann and Wulf are no longer involved in the lawsuit, it is notable that Hirschmann was unaware of either of them, despite the representations made in plaintiffs' April 21, 1999 memorandum. Hirschmann also did not know whether any other individuals had been offered as class representatives (Hirschmann Dep. at 126:9–127:5), and did not recognize the names of any of the other proposed class representatives or initial named plaintiffs, providing further indication that he has not taken an active role in this lawsuit. (*Id.* at 127:19–128:16; 150:14–151:6.)

appointment in 1999. (*Id.* at 149, 154 (ten to twelve phone conversations with counsel, plus four to six letters and eight to ten e-mails, many of which presumably concerned scheduling his deposition).) Finally, in 1999 the lead plaintiffs and counsel stated that they had "developed and agreed to follow a plan for holding regular conference calls at regular intervals to discuss the case as it progresses and at all major thresholds, and to ensure the involvement of the Lead Plaintiffs in the decision-making process" (Pl. Mem. In Further Support at 4), but Hirschmann testified at his deposition that he had participated in only two conference calls with counsel. (Hirschmann Dep. at 154.) Plaintiffs even acknowledged in their reply that the lack of communication between lead counsel and the lead plaintiff was problematic: "Accordingly, Lead Counsel and the proposed class representatives have recently conferred with one another regarding the status and future progress of the case; e-mail addresses and telephone numbers have been exchanged; and future telephone conference calls are scheduled to be held on a regular basis." (Pl. Reply at 23.) Unfortunately, this is almost identical to the representation made by counsel in 1999. (*See* Pl. Mem. In Further Support at 4.)

For these reasons, there is insufficient evidence before the Court to conclude that Hirschmann as sole lead plaintiff can adequately protect the interests of what is purported to be a class of thousands.[15] As a result, the Court is unable to proceed to

consider plaintiffs' motion for class certification until adequate lead plaintiffs have been identified.[16] Because defendants have challenged only the adequacy of the proposed class representatives, it appears that any lead plaintiffs who satisfy the requirements of the PSLRA—which includes meeting the adequacy prong of Rule 23—will necessarily be satisfactory class representatives. But the Court must defer ruling on plaintiffs' motion for class certification until it is satisfied that the requirements of the PSLRA have been met.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion for class certification is denied without prejudice. A separate Order accompanies this Opinion.

### *ORDER*

Based upon review of plaintiffs' motion for class certification, defendants' opposition, and the entire record set forth therein, it is hereby

**ORDERED** that plaintiffs' motion [132–1, 133–1] is **DENIED WITHOUT PREJUDICE**; and it is

**FURTHER ORDERED** that the parties shall appear before the Court for a status hearing on April 26, 2002, at 10:30 a.m.

**SO ORDERED.**

---

15. It is important to note that the Court's concerns about Hirschmann as the sole lead plaintiff are not based in any way on his substantive knowledge of the case. Whether Hirschmann, for example, "is familiar with the term 'generally accepted accounting principles,' [or] SOP 97–2," or knows why the price of Baan stock dropped is irrelevant to his suitability as lead plaintiff. (Def. Opp. at 21.) As plaintiffs note, what matters is

whether Hirschmann "has demonstrated a commitment to the suit." (Pl. Reply at 22) (citing *Miller v. Material Sciences Corp.,* 1999 WL 495490, at *4 (N.D.Ill. June 28, 1999)) (adequacy requirement of Rule 23(a)(4)).

16. The Court does not mean to suggest that Hirschmann may not participate as part of a small group of co-lead plaintiffs.